*430 Opinion of
Chief Justice Bren.
This case involves, 1st, the merit and demerits of conflicting adversary claims derived from tile State of Virginia, depending upon ru]es for determining the precision and specialty of entries: 2dly, The construction of the compact between the State of Virginia, and the State of Kentucky.
By bill exhibited in March, 1821, the complainant, Beard and wife, ask relief against a judgment in ejectment obtained by Smith, J
The complainants rely upon this entry:

“June 2d, 1180.”

“Arthur Campbell enters 600 acres upon Ty. Wf. on Elat creek, about two miles northwest, of the main Gap of Cumberland mountain, on the road passing to Kentucky, from Powell’s valley, to begin at the said road, and to extend up in the forks of said creek, including the right hand fork for quantity.”
“Surveyed 8th February, 1796‘”
“Patented to Arthur Campbell, 8th November, 1796.”
The defendant derives his claim under an entry for William M’Elwee, of the 22d January, 1787, for 1000 acres, surveyed, 21st March, 1787; patented 3d June, 1795, to William M’Elwee.
The defendant relies first on the want of special* ty and precision in the entry of Campbell: Secondly, that the said entry has become void, because not surveyed within the time prescribed by the laws of Virginia, and he claims the full benefit and protec- *431 lion of the compact between Virginia and Kentucky.
Call for a creek by a wrong name, Flat creek, instead of Yellow creek, whereby it was generally known, not fatal — other descriptions sufficiently pointing out the stream.
Descriptions in an entry are not required to be the best, not misleading, . but certain to a common intent, is sufficient.
Mistake in one part of an entry cor rected by another.
Mistake in the name of a stream, not fatal.
*431 The entry of Campbell is assailed, because the creek is called Flat creek, a name not known or used by any but this locator to designate the stream -assumed, whereas, it was generally and notoriously called Yellow creek; and because the road assumed was not the road to Kentucky, from the Cumberland Gap, at the date of the entry; but that another road crossing Yellow creek, considerably lower. down, was the road then used.
• The failure to call the stream Yellow creek, as it was generally then called, does not vitiate the entry.
The description, given by reference to the course and distance from the Cumberland Gap, will fit no other stream but Yellow creek. The Cumberland Gap was as universally known as Yellow creek; the reference from the Gap, by the northwest course, distance of two miles, was not deceptive, nor misleading, but unerringly certain to lead the enquirer to Yellow creek, as that called Flat creek in this entry.
No decision has yet required of a locator, that his description should be the best that was possible. If not misleading, certain to a common intent, and sufficient to lead others, using reasonable diligence to the place; it has been heretofore decided to be sufficient. (Johnson vs. Nall, pr. dec. 393; Roberts vs. Huff, Hard. 382; Bush vs. Todd, 1 Bibb, 64, 65; Whitaker vs. Hall, 1 Bibb, 73, 75; Hite vs. Graham and Grayson, 2 Bibb, 144.) A mistake or defect in one part of the description may be corrected or supplied by accuracy employed in another part. (Craig vs. Machir, 1 Bibb, 12; Swearingen vs. Smith, 1 Bibb, 92; Smith vs. Harrow, 1 Bibb, 102, 104; Taylor vs. Kincaid, Hard. 82; Helm’s heirs vs. Craig, Hard. 112; Respass vs. Arnold, Hard. 113; Markham vs. M’Gee, Hard. 374; Lee vs. Wall, Hard. 430; Speed vs. Wilson, pr. dec. 92; Blaine vs. Thompson, 3 Bibb, 143; Fowler vs. Halbert, 3 Bibb, 387; Lipscomb vs. Grubbs, 3 Bibb, 400; Bradford vs. Patterson, 4 Bibb, 587; Evans’ heirs vs. Manson’s executor, 1 Bibb, 5 to 7.) In the case of E *432 vans’ heirs vs Manson’s executors, an entry calling for Hiclcman creek, was sustained for land on Jessamine creek, by reason of the other descriptions contained in the entry. The call for Flat creek, therefore, was not misleading, but corrected by the accuracy of the other description contained in this entry.
Affirmative and negative testimony.
Aptness of the calls for the objects on the ground, held to establish and fix the entry.
The existence of the road which is claimed by the complainant, (crossing big and little Yellow creek, above their junction,) before the date of this entry, and ever since, for it is now the great State road, cannot be denied. The number of affirmative witnesses of unimpeached characters, carry conviction to the mind, that this road did exist long before 1780, and then, and even since, and that it was a road generally used. These affimative witnesses, so many in number, must countervail all effort to prove the negative by witnesses, who knew the other crossing lower down the creek, but did not know this.
' Taking it as proved, that both roads existed in June, 1780. Yet no uncertainty hence arises. The description in the entry identifies the road Intended, the one will lead to the forks of the creek, the other road will not, the lower road will not fit the description of the entry; it will give neither the forks of a creek, whereof the right hand fork can be included, nor any creek near the distance called for.
The description in the entry does very aptly and certainly fit, and adapt the location to Yellow creek, and to the upper road crossing above the junction of the two forks, called upon the plat, big'and little Yellow creek.
The entry of Campbell is valid. As to the greater part of the land, intended by the locator to be appropriated, no doubt exists.
The difficulty is in ascertaining the exterior lines which are to circumscribe the whole. The forks of the creek, the road, and including the right hand fork, are objects used for special location. We see from the entry, that both creeks, the left hand and right hand fork, were in the mind of the locator; he *433 calls “to extend up in the forks of said creek;” the road also is an object of special location, as well as Ihe forks of the creek; for he calls “to begin at the said road.” Flat creek is used as general description; so of two miles, N. W. of the Cumberland gap; those expressions are used to lead into the immediate vicinity of the land intended to be appropriated.
Mode of surveying the entry discuss, ed and settled in this opinion.
Effect of the expressions in the entry ■ — “to begin at the said road, and extend up in the forks of said creek,” &c.
Base line on the road.
Expression “including tlie right hand fork for iield" toJre-quire the land to be eaual^uan-tity on each sido of the fori".
*433 Having so described the vicinity, the locator then by way of special and precise location says, “to begin at the said road,” “extend up in the forks of said creek,” “including the right hand fork for quantity.” The road crosses both forks, and the distance on the road from the gap of the mountain, terminates between the two forks; the distance from the one to the other, along the road, is about seventy poles. The distance from the gap of two miles was not used in the entry to designate the precise point of beginning on the road; but to identify the forks of the creek, and to describe generally the land intended. The locator has said, “to begin at the road;” at what part or point on the road? He has not designated the crossing of either fork in preference to the other; the distance terminates near midway between them. Having declared his intention “to begin at the said road,” his next intention is declared by the words, “and to extend up in the forks of said creek;” these two expressions combined satisfy my mind, that the locator had in view the whole space from one fork to the other; the whole of the road between tlie forks, “to begin at the said road, and to extend up in the forks of said creek,” necessarily places us on the road, between the two streams, within the fork made by the junction of them, and not outside, and to tlie north of the main stream.
The locator seems to have had in mind the whole distance on the road between the two forks, “to begin at the said road, and to extend up in the forks,” plainly indicates the whole distance on the road from fork to fork. That the locator so intended, is also signified by the next words “including the right hand fork for quantity.” This last expres *434 sion carries us out of the forks, over the right hand fork on the northwardly side. I think it clear that the locator intended to make the road from the left hand-fork to the right hand fork one part of his boundary; also, the left hand fork, to some extent, another part; and has furnished us with the expres-¡dons, “including the right had fork for quantity,” as the means and additional description for corn-pleting the survey.' According to the best lights which I can discern, from the constructions heretofore given to entires, it seems to me that the survey should be thus constructed,
The whole of the road between the forks, and so far up Little Yellow creek with its meanders on the north westwardly side thereof, and so far along the road on the north side of Big Yellow creek, should he taken, as will give the base of a square área of six hundred acres, when reduced to a right line, that base to be bisected by a point on the road, at the crossing of the right hand fork, called Big Yellow creek; from the extremities of the haseso taken, construct the survey for the quantity up tiie right hand fork, by lines parallel to the general course of the said fork, as far as’will be included in this survey, the closing line to be at right angles to these parallel lines; and so the said general course of the right hand fork, bisecting the survey as nearly as practicable. This mode of surveying will conform to the principles of construction, in the cases of Davis vs. Lockhart’s heirs, (Hard. 368,), Whitaker vs. Hall, (1 Bibb, 79,) Kincaid vs. Taylor, (2 Bibb, 122.) The governing description for obtaining the quantity in this entry is, “including the right hand fork,” such description of including a road or a stream, has, I think, been invariably construed to put an equal quantity on eacb side, as near as may be, in all cases where the base was not fixed and determined, but in whole, or in part) to be directed by construction. In this case the base line is to be ascertained by construction. I think the road and space between the two streams, and up the left hand fork is described sufficiently, as the northwardly boundary; but the distance up the left hand fork and along the road, is to be ascertained by construction, *435 and must be governed and controled by the descrip-lion, including the right hand fork for quantity. To take the base line up the right hand fork, so as merely to include the stream in the survey, and thence to extend at right angles over into the space between the two streams, seems to me to reverse and destroy the order of the entry, and to change the capital direction, “including the right fork for quantity,” into a minor object of description, and substitute in its stead, the description of “extending over into the forks for quantity” as the capital direction.
objected that ant>°s°entry11* had been forfeited by the ha^eitsur veyc'd.
Act of 1779. Duties of that act were precedent to those of the owners of the entries. No time was then limited to make the surveys.
The entry being special and precise, the defence under the compact between Virginia and Kentucky must be examined. It is agreed that the laws of Kentucky, extending the time for complying with the requisitions of the act of Virginia, of 1785, concerning surveys, are contrary to the compact and void, therefore, the entry of Campbell, of 1780, not surveyed until 1796, has become forfeited and void, ff this be so, then the elder grant must prevail, for a complainant in equity can recover only by the validity of his own claim, not by the weakness of his adversary’s.
The better to understand this defence, a view of the successive acts of Virginia and Kentucky, respecting surveys, becomes necessary.
By the act of 1779, (chan. rev. chap. 13, p. 95, 1 Litt. laws 411,) which prescribed the terms to purchasers and claimants, and constituted the land office, no time was limited for causing surveys to be made. The duties to be performed by the surveyors appointed by the government, were acts precedent to the duties to be performed by the owners of entries towards completing the surveys. It thus provided:
“Every chief surveyor shall proceed with all practicable despatch, to survey all lands entered for in his office, and shall, if the party live within his county, either give him personal notice of the time at which he will attend, to make such survey, or shall publish such notice by fixing an advertisement *436 thereof at the door of the court house of the county, on two several court days, which time so appointed, shall be at least one month, after personal notice given, or after the second advertisement so published, and if the surveyor shall attend accordingly, and the party, or come one for him, shall fail to appear at the time, with proper chain carriers, and a person to mark the lines if necessary, his entry shall become void, and the land thereafter, subject to the entry of any other person, and the surveyor shall return him the warrants, vrhich may, notwithstanding, be located anew upon any other waste or unappropriated lands, or again upon the same land, where it hath not, in the mean time been entered for by another person."
It seems all the surveyors omitted' to give the notices required, by the act.
Act of ’84 requiring file entries to be surveyed within a limited time.
By a previous section it is declared, “and every surveyor shall, at the time of making entries for persons not being inhabitants of his county, appoint a time for surveying their land, and give notice in writing to the persons making the same.”
The known and acknowledged history of this country, attests the fact, that the surveyors never have complied with those requisitions, (see Simpson vs. Register, pr. dec. p. 256.)
Under the original act, the public officer was bound to do the first act; until he performed that precedent act, the entry could not be forfeited for want of surveying.
The next act on the subject, is of 1784, (chap. 14, sect. 1 and 2, of October, sess. p. 7, 1 Litt. laws, p. 451,) it recites, “whereas several persons having early entries and locations for large tracts' of lands, in order to procrastinate the charge of surveying, and the payment of taxes, refuse or neglect to survey them, while others who have adjacent entries, and locations pf later date* are desirous to sue out grants, and pay taxes for their lands; in aid of the present mean's to compel surveys upon said entries; be it enacted, that all entries made in the county surveyor’s books, on the western waters, (other than entries made by virtue of officers’ and soldiers’ claims for military services,) before the passing of this act, shall be surveyed, and the sur- *437 Téys thereof returned ,as the law directs, on or before the first day of February, one thousand seven hundred and eighty-six; and that all future entries shall be in like manner surveyed and returned within one year after the date of every such entry. If any entry shall not be surveyed and returned within the terms aforesaid, it shall be lawful for any person to enter for, and locate the said lands in like manner, as if such prior entry had not been made.”
Act of ’85, directing thij surveyor to give notice to the owners of entries when he would make the surveys.
First act was to bo performed by the surveyor, according to the act of ’79, and in certain cases by the act of :85, and his neglect could not forfeit the entry.
*437 The act of 1785, (p. 31, chap. 41, 1 Litt. laws, p. 454,) recited that the time limited by the act just recited, of 1784, “hath been found too short for the owners of entries to carry the same into actual surveys, and the mode therein prescribed, being found inconvenient.”
Sec. 2. “So much of the said recited act, as directs, that all entries made before the passing of the said act, shall be surveyed by the first day of February next, or for the surveying all .future entries on the western waters within one year from the date thereof, be and the same is hereby repealed.”
Sec. 3. “And he it further enacted, That immediately after the first day of January, in the year 1787, the principal surveyor of every county on the western waters, shall, and he is hereby required to give notice to all persons claiming land by entry within his county, or to their agents, attornies or other persons acting in their behalf, either personally, or by affixing the same at the court house door, or other usual place of holding the courts of the said county, on two several court days, that he will proceed by himself or his deputies to survey the lands therein mentioned, on a day which he shall appoint, which day so appointed, shall be one month at least after the notice given, or last time of advertising of the same. And if any person, his agent and attorney, as aforesaid, shall fail or neglect to attend the surveyor with chain carriers, and a person to mark the lines as required by law, on the day appointed for that purpose, such entry shall become void, and the lands liable, &c” repeating the precise words of the act of 1779, before recited.
By this part of the act of 1785, as well as by the act of 1779, it is clear that the officer of the gov- *438 eminent wag required to do the first act, by giving' notice, personally, or by advertisement of the time’ when he would attend to make the survey, either by himself or deputy. If the officer did. not perform his duty, the owner of the entry could not loose his right by forfeiture.
In the act of ’85 non-resident owners of entries were required to appoint agents to attend the surveyor, and the neglect to appoint declared a forfeiture.
Resident of the county of the entry was not required to appoint an agent.
But the act further declares, “And the owners of entries already made, shall, on or before the said first day of January, appoint some person within the county where the lands lie, or their agent or attorney, who shall give notice of such appointment to' the surveyor within one month thereafter, or on failure thereof, his entry shall become void. Provided, that nothing in this or any other act, shall extend to forfeit or make void any entry claimed by infants or prisoners in captivity, but that all such persons shall have three years after their several disabilities are removed, to complete the same; provided also, that if on the day appointed by the surveyor for the surveying any entry as before directed, he shall be prevented by accident, or other cause from making the same, such entry shall not, in that case, become void; but tbe surveyor shall give other notice as often as such cases shall happen.”
By this third section of the act of 1785, compared with the act of 1779, it is obvious that the act of 1779, was not repealed; the first member of the section intended to stimulate the surveyor to perform the duties prescribed to him by the act of 1779, by assigning a day, immediately after which he was required to give the notice of the time when he would make each particular survey. Every candid mind who has ever looked into the entry books in Kentucky, and the volumes of entries made before the passage of the act of 1785, will acknowledge that act to have been theoretic legislation, impossible in practice. To require of the surveyors of Kentucky, immediately after the first day of January, 1787, to assign day, and give notice for surveying each particular unsurveyed entry, was imposing a duty beyond the powers and means of tbe surveyors. In practice the surveyors never did comply, it was impracticable. In the construction of this act of 1785, *439 the act of 1779, must also be kept in view. If tbe owner of an entry resided in the proper county, the surveyor was required by the act of 1779, to give -notice personally or by advertisement, at the door of the Court-house; this provision is kept in view in the act of 1785. The requisition that the owners of all entries then made, should, before the first of January, 1787, appoint an agent within the county, and give notice of such appointment to the surveyor, taken in connection with the other parts of this act and the act of 1779, means that persons not resident in the county shall appoint an agent; to require, absolutely that a resident within the county should, nevertheless appoint some other person within the county, to be his agent, would be a farfetched and absurd construction. The case of Simpson vs. Register, (prin. dec. 256,) has settled the construction, that a resident of the county was not required to appoint an agent, and that his entry could never have been forfeited under the provisions of the act of 1785, but by the previous performance by the surveyor, of giving notice personally, or by advertisement, and the subsequent failure of the owner to attend the surveyor at the time appointed.
Query, how the neglects of the owners of entries to appoint their agents or attend, to the surveyor’s notices, were to bo ascertained, or decided on,and how the entry declared foi feited.
The act of 1779, as well as theact of 1785, makes the attendance of the surveyor or his deputy, on the day appointed, indispensible to the forfeiture.
Upon the act of 1785, these suggestions present themselves: The forfeiture was to accrue, either by failure of the owner to attend according to notice, personally given to him, or by advertisement, or by his failure to appoint an agent and notify him to the surveyor; where the surveyor gave notice in either mode and failed to attend, no forfeiture accrued. The surveyor is not required to record his notices, given personally or by advertisement; nor to record his non attendance in person or by deputy according to notice; nor to record the notices to him given, of the appointments of agents. All these are matters in pais. If this act of 1785 had not been prolonged and finally substituted by another, different in terms, these queries would have *440 arisen, and been pressed upon the courts for deci sion. Was the surveyor constituted sole judge, whether a person had or not fallen under the predicament which relates to the appointments of agents, of the sufficiency of the notices to him; of the sufficiency of his own notices; and of the causes why a survey was not executed? Was the surveyor, upon his judgment of all or any of these matters, to declare the entry forfeited, and deliver out the warrant as in case of forfeiture, to be re-entered else where or again on the same land? Was a right instituted of record, to become void by matters in pais, without trial or adjudication? Or was an inquisition of office, and judgment founded thereon, necessary to complete the forfeiture? To give a direct response to these questions, has become unnecessary; but to bear them in mind may not be unprofitable in considering the construction of the compact between the two States.
Act of 1786, giving farther time for the appointment of agents by the owners of entries.
Act of 1788, giving farther time for owners of entries to appoint their agent,?,
*440 The next act is that of 1786, (p. 14, ch. 11; 1 Litt. Laws, p. 456.) The first section recites that the act of 1785, “requiring that the owners of entries shall appoint agents or attoi’nies in each county where such entries are made, and notify such appointments to the principal surveyor of the county, by the first day of February, one thousand seven hundred and eighty seven, and declaring that on failure thereof, such entries shall be void, whereby many of the good people on the western waters, through ignorance of the said recited act, are likely to be injured by a forfeiture of their entries: for remedy whereof, sec. 2. Be it enacted, That no entry shall be forfeited under the.said recited act, for and during the term of two years after the passing of this act.”
This session of the legislature of Virginia, commenced on Monday the sixteenth day of October, 1786, and this act took effect the first day of the session, the time of its passage must be sought by the journals.
The next act in order of time, is that of October session, 1788, (p. 13, chap. 21; 1 Litt. laws, p. 461.) The first section recites the act of 1785, and the provisions respecting the appointment of “agents or *441 attornies in each county where such entries were made” &c.; the second section recites the act of 1786, and its provisions, whereby, “it was declared that no entry should be forfeited under the above recited act, for and during the term of two years, which time will expire during the present session &c.”
Act of Vir-S'ir|ia timcTfoMbe ° owners of en-bies Io c°m‘ e continued by tlie sntwo-<Fent act?>
Act of Kentucky oi,£,^ extending^! time.’
Act of Dec. l”s p *'
"Be it therefore enacted by the General Assembly,. That the farther time of two years, shall be allowed to the owners of entries on the western waters, to comply with the requisitions of the above recited act, during which time ho such entry shall be forfeited.”
The next act was passed by the General Assembly of Virginia, at November session of 1790. It recites that the act of 1785, which was continued by subsequent acts, “will expire during the present session of Assembly, and it is expedient that the same should bé further continued: Be it therefore enacted by the General Assembly, That the further time of two years shall be allowed to the owners of entries on the western waters to comply with the requisitions of the above recited act, during which time no such entry shall be forfeited.” (1790, chap. 10, sec. 1, p. 7; 1 Litt. L. p. 462.)
The next act in order was that passed by the General Assembly of the Commonwealth of Kentucky, approved 8th November, 1792; (1 Litt. L. 115; 2 Dig. 714.) This act recites that the act passed by the Assembly of Virginia of 1785, “which hath been continued by subsequent acts, will expire before the same can be complied with: Beit enacted by the General Assembly, That the above recited act be continued from the passage hereof, and the farther time of one year, from the first day of January next; be allowed the owners of entries to comply with the requisitions of the same, during which time no such entry shall be forfeited.”
The act passed 7th December, 1793, (1 Litt. L. 172; 2 Dig. 714,) alludes to the act of 1785, and continuing acts of Virginia, and one of Kentucky, and then enacts, “That the further time of two years *442 from the first day of January, be allowed to the owners of entries to comply with the requisitions of the said recited act, during which lime no entries shall be forfeited.”
Act of 1785, extending the time for surveying entries and returning plats and certificates.
Act of 1797, extending the time given by the former acts to execute, survey and return the certificates.
The act approved December 15th, 1795, ( 1 Litt. 288; 2 Dig. 717,) recites: “Whereas the time for surveying of entries will expire on the first day of January next, also an act entitled, an act giving further time to the owners of plaits and certificates to return the same, will expire at the end of the present session, therefore: Be it enacted by the General Assembly, That there be allowed until the last day of November, one thousand seven hundred and ninety seven, to the owners of entries to,survey the same; (this act gives further time also for returning platts and certificates of survey to the Register’s office,) any law to the contrary notwithstanding.’)
By the act approved November 29th, 1797, (1 Litt. L. 696; 2 Dig. 717,) it is recited, “Whereas it appears that an act passed by the Assembly of Virginia, in the year of our Lord, 1785, entitled, an act to repeal an act entitled, an act concerning entries and surveys on the western waters, which has been continued by subsequent acts of the legislature of Virginia and this State, may subject the owners of entries to forfeiture of the same, if the requisitions of the said acts should .,:ot be complied with; for remedy whereof,
“Sec. L Beit enacted by the General Assembly, That the further time of ten months, from the last day ©f November, one thousand seven hundred and ninety-seven, be allowed the owners of entries to survey the same in any part of this State, which is not set apart by treaties for any tribe of Indians: Provided however, that no forfeiture shall arise to the claimants of entries within the boundary ceded by Congress to the Indian tribes, until further provided for by the legislature, and that the farther time of two years be given to survey all entries made, either to adjoin the line to be run between this State and Virginia, or the line adjoining the lands reserved for the officers and soldiers south of Green river, or any entries dependent on such entries, any law to the contrary notwithstanding.”
Held the entry of Campbell, surveyed ir >1796, was not forfeited by any neglect touching the surveying,if, the statute be valid.
Neglect to comply with the requisitions of the act of ’65, and the con? tinning acts, was a cause why the government might foifeit the entry, until after which no individual could acquire an interest.
Definition of a forfeiture.
“See. 2. Be it further enacted, That the further time of one year be allowed for returning all plaits and certificates of survey to the Register’s office: Provided that nothing in this or any other act shall extend to forfeit or make void any entry claimed by-infants, feme coverts, persons non compos mentis, or prisoners in captivity, but that all such persons shall have three years after their several disabilities are 3’emoved, to complete the same.”
This history of the acts of the General Assembly of Kentucky and of Virginia, demonstrates that Campbell’s entry has npt been lost by neglect to survey in due time, unless there, is something in the compact between these States prohibiting the legi#= lature of Kentucky from- extending the time, for complying with the requisitions of the act of 1785, or for making surveys.
Whilst on the subject of the acts themselves, it' is proper to remark that the failure of the owner of an entry to comply on his part, with the requisitions of the act of 1785, is treated by the legislatures as cause of forfeiture; that this right of forfeiture belonged to the government, to be exercised at the pleasure of the government; that the individual right of any other citizen in the land forfeited, was to be acquired after the forfeiture accrued, if at all.
The act of 1785, in the proviso, calls it a forfeiture, “provided that nothing in this or any other act shall extend to forfeit or make void any entry claimed by infants” &c. all the subsequent acts call it a forfeiture; it is so according to the truth and effect; Forfeiture is most generally used to signify, rather the effect of transgressing a penal law, than the transgression itself; thus we say that the lands are forfeited, the goods and chattels are forfeited by treason or by felony; the transgression is treason or felony, the effect of the transgression is loss of the lands, or of the goods and chattels. Forfeiture is derived by Cunningham, in his law dictionary, from the latin foris factum, French forfait, signifying trespass, transgression, crime. Coke, in his commentary on Littleton, (59 a.) gives the definition of forfeiture, by saying it is derived from the latin, *444 the adjective is foris factus, the verb foris facere, and the noun foris factura, foris extra, and legem facere, that is to act against or without law or custom. Bacon, in his abridgment, title Forfeiture, defines it, “the omission or neglect of a duty which the party binds himself to perform, or to the performance of which he is enjoined by tbe law, is upon the breach or neglect thereof, called a forfeiture, that is, the advantages accruing from the performance of the thing, are by his omission defeated and determined.”
Statute of 1785, ami the 'continuing acts, provid- . ir>g that for the neglect of the owner of the entry to appoint an a-genf, or attend the surveyor, when ■required by notice, the entry should becouie void, did not ipso facto make the entries void, but only gave the government the power to over them, to be enforced or renounced at pleasure.
This definition includes forfeitures of conditions, obligations, offices, and-estates, and other penalties, accruing in civil cages/or inflicted for transgressions or omissions of duty imposed by law, or as it relates to' crimes arid offences. The penalty imposed by .the law of 1785, for a failure to appoint an agent, and to notify the surveyor, or to attend the surveyor according to the surveyor’s notice, is a forfeiture according to the strict legal definition, and the several acts of Assembly which call it a forfeiture, have truly described it by the legal effect and consequence. Virginia, in legislating upon this subject, in the act of 1785 and the continuing acts, have treated this forfeiture as a public right, subject to legislative control, as one in which no private citizen had or could acquire a particular .individual right, until after the forfeiture had been actually incurred and inflicted- The penalty inflicted ás well by the act of 1779, as by tbe act of 1785, for a failure to comply with -the requisitions, was expressed in these terms: “his entry shall become void, and the land thereafter, subject to the entry of any other person, and the surveyor shall return him lijs warrant, which may, notwithstanding, be located anew, upon any other waste or unappropriated lands, or again upon the same land, where it bath not, in the mean time, been entered for by another person.” The penalty is first to be incurred by the owner of tbe entry; thereafter tbe land is subject to be entered by any other person. The forfeiture of the land, or of tne incipient right to the land acquired by the entry, must first accrue to the government, thereafter, another citizen may acquire an interest in the .land forfeited, by a subsequent ap *445 propriation. The words used by the act, in declaring the forfeiture, are in the future tense, “his entry shall become void.” The entry is not void ab initio so as to sanction or legalize the claims of individuals who may have illegally located or surveyed or appropriated the land described in the entry, before any forfeiture of that entry actually incurred; but the forfeiture is a condition precedent to the permission to another to acquire an interest in the thing forfeited. After the right of the owner of the entry is forfeited, after the entry has become void, and thereby the incipient right of the owner in the land described in the entry, has been reinvested in the government, then and not till then, another individual was permitted by subsequent entry, to acquire an interest or right. If the Commonwealth never did acqiiire a right by forfeiture, if the entry never became void, then by the express terms of the acts of 1779 and of 1785, and the continuing acts of Virginia, another person could not acquire a right or interest, individually and distinct from the Commonwealth, in the penalty. The act of 1785, presbribes the duties of the surveyor and the duties of the owners of entries, if the owners fail on their part, and the surveyor is in no default in his, the “entry shall become void, and the lands liable to be again entered for by any person holding a land warrant.” The forfeiture is thus held by the Commonwealth in her own hands, as a public power and right, not sold out, nor gaged, nor wagered to individuals.
Distinction between the acts o°1784, requiring entries to and'the certificates returned in a of and the act of 1785, requiring the aPP°“ttnent of an agent, and the surveyor to be attended.
*445 The distinction between declaring the “entry shall become void,” and declaring it void ab initio, so as to sanction previous acts of others, is obvious, and intended to be kept up and preserved by the legislature of Virginia. The act of 1784 required entries made, to be surveyed and the surveys thereof returned as the law directs, on or before the first of February, 1786, and future entries to be surveyed and returned within one year after the date of every such entry, and “if any entry shall not be surveyed and returned within the terms aforesaid, it shall be lawful for any person to enter for and locate the said lands, in like maimer as if such entry *446 bad not been made.” The repealing act of 1785, declared the time in the act of 1784 too short, and the mode inconvenient as therein prescribed for compelling surveys, and then enacts a different mode. Instead of limiting a time within which the entries should be surveyed and returned, and if not, a forfeiture of the entry; and subjecting the lands to be located and entered for by any other person, “as if such prior entry had not been made,” as in the act of 1784, the act of 1785 requires the surveyors to proceed after a given day, immediately to give notice, personally or by advertisement, of the clay on which he will proceed to survey the land in each entry specified in his notice; and requires the owners of entries to appoint agents by the tima specified in the act, and give notice thereof to the surveyor. By the act of 1784, whether the entry had or had not been surveyed as required, could be ascertained by the returns and records in the surveyor’s office; if not so returned, then any one might thereafter enter the land as if no such entry had ever been made. As this act applied to previous and subsequent entries, and as to the latter, the limitation for surveying run from the date of each particular entry, the mode was very inconvenient, as forfeitures might accrue and entries might be sub sequently made before the legislature could be apprized of or could release the forfeiture. These two acts contrasted as to their modes and provisions, show that the legislature had in view the distinction between, void by matter of record, and void by matters in pais; between legalizing the entries of others for forfeited lands, “as if such prior entry bad not been made,” and declaring that the entry should become void, and thereafter subject to appropriation, between a private right and interest acquired in the land, and a general and public power over forfeitures. In both acts the legislature reserved the power to prevent forfeitures from accruing, if in their discretion and view's of public policy, it should be proper so to do. By all the acts of Virginia it is dear that upon the subject of forfeitures for want of surveys, the legislature had cautiously abstained from suffering any individual to *447 acquire a private individual interest in the land to be forfeited, that is to say, in the forfeiture, before it had actually accrued. Her system of legislation upon this subject of forfeiture, was the exercise of a public power for public benefit; it grew out of a desire to increase her revenue, and was connected with, and incident to, the system then prevailing, not to tax unpatented lands. Her faith was in no degree pledged to enforce these threatened forfeitures, by reason of any private interest in the penalty pro* inisedto individuals. Until after forfeiture actually accrued, no individual could enter for or acquire an interest in the forfeiture.
At the date of the separa tion of Kentucky from Virginia, no forfeiture had been in fact incurred, and the now statute acquired all the power to forbear to impose the threatened forfeiture Virginia had possessed.
Separation of ICentucky and constitu ¡ tion of it into an independent state and admission into the Federal union.
Byherlaws, she refrained from compelling forfeitures during the time her fight of dominion continued over the district of Kentucky. She delivered the .dominion and her public rights over the soil, to the State of Kentucky, before any forfeiture iiad accrued. Kentucky received the sovereignty and dominiori from Virginia, and thereby acquired the governmental power to release or relax this system of threatened forfeiture, unless there is some restrictive provision to be found m the fundamental articles for separation agreed upon.
These fundamental articles of separation have the highest obligation and most sacred claim to good faith and due observance. They were contained in an act of the Virginia legislature, proposing them to the people of the district of Kentucky, as the fundamental articles of separation and dismemberment of one portion of the State of Virginia from the other, to be considered and accepted or rejected in a convention of delegates chosen by the people of the district of Kentucky, for that special purpose; they were assented to by that convention; they became a solemn compact, ratified and sanctioned, as such, by Virginia and Kentucky, engrafted into the constitution of Kentucky as a part ox it, anti Kentucky was admitted into .the federal union of States, by the assent of the Congress of the United States, based upon the act of the Virginia legislature as senting to it; (see laws U. S. vol. 1, chap. 44; vol. 2, chap. 78, p. 191 of Bioren’s cd.; Acts of Virg. *448 1789, chap. xiv, sec. 15, p. 9; 1 Litt. L. p. 17; 1 Dig. p. 17.)
Act of Virginia proposing the separation and now constituting the compact.
The act of the General Assembly of Virginia, which proposed the terms of separation and fundamental articles of the compact between the two States, passed the 18th December, 1789.
The first section recites, “Whereas it is represented to this present Genera] Assembly, that the act of the last session entitled, an act concerning the erection of the district of Kentucky into an independent State, which contains terms materially different from those of the act of October session, 1785, are found incompatible with the real views of this Commonwealth, as well as injurious to the good people of the said district.”
This second section then provides for the election of representatives to compose a convention for the purposes mentioned in the act, fixing the month of May, 1790, as the time of ejection.
The second and third sections regulate the election and duration of time, directs the poles to be opened for five days, and the act to be read on each day before opening the polls, at the door of the Court-house.
“Sec. 4. The said convention shall be held at Dan-ville, on the 26th day of July next, and shall and may proceed, (after chosing a president and other proper officers, and settling the proper rules of proceeding,) to consider and determine whether it be expedient for, and the will of the good people! of the said district, that the same be erected into an independent State, on the terms and conditions following:”
First: The boundary to be according to the then, boundary of the district.
Second: The proposed State of Kentucky to assume a just proportion of the debt of the United States, and the payment of all certificates issued on account of the several expeditions from the Kentucky district against the Indians since the first day of January, 1795.
*449 “Third: That all private rights and interests of lands within the said district, derived from the laws of Virginia prior to such separation, shall remain valid and secure under the laws of the proposed State, and shall be determined by the laws now existing in this State.”
Fourth: That the lands within the proposed State of non-resident proprietors, shall not be taxed higher than the lands of residents prior to the admission of the proposed State to a vote by its delegates in Congress, where such non-residents reside out of the United States, nor before, nor after such admission, where such non-residents reside in Virginia, within which this stipulation shall be reciprocal; or where such non-residents reside in any other of the United States, which shall declare the same to be reciprocal within its limits; “nor shall a neglect of cultivation or'improvement of any land within either the proposed State or this Commonwealth, belonging to non-residents, citizens of the other, subject such non-residents to forfeiture, or other penalty within the term of six years, after the admission of the said State into the Federal Union.”
“Fifth: That np grant of land or land warrant to be issued by the proposed State, shall interfere with any warrant heretofore issued from the land office of Virginia, which shall be located on land within said district, now liable thereto, on or before the first day of September, one thousand seven, hundred and ninety-one.”
“Sixth: That the unlocated lands within the said district, which stand appropriated to individuals or description of individuals, by the laws of this Commonwealth, for military or other services, shall be exempt from the dispostion of the proposed. State, and shall remain subject to be disposed of by the Commonwealth of Virginia, according to such appropriation, until the first day of May, one thous- and seven hundred and ninety-two, and no longer: thereafter, the residue of all lands remaining within the limits of the said district, shall be subject to the disposition of the proposed State.”
Assent of Congress admitting Kentucky into the federal union, and the. government commenced Juno 1st, 1792.
Powers and sow reignty of Kentucky
“Seventh: Regulates the use, navigation and jurisdiction of the river Ohio.
Eighth article, provides in case of complaint or dispute between the two States, “concerning the meaning or execution of the foregoing articles, the same shall be determined by six commissioners,” two be chosen by each of the parties, the remainder by the commissioners so first appointed.
Sec. 14. Provides, that if the said convention 'shall approve of the erection of the said district into an independent State, on the foregoing terms and conditions, they shall fix a day posterior to the first day of November, 1791, on which the authority of Virginia, “and of its laws under the exceptions aforesaid, shall cease and determine forever, over the proposed State, and the said articles become a solemn compact, equally binding on the parties, and unalterable by either, without the consent of the other.”
Sec. 15. Contains the proviso, “that prior to the first day of November, 1791, the general Government of the United States shall assent to the erection of said district into an independent State, and release this Commonwealth from all its federal obligations, arising from the said district as being part thereof, and shall agree that the proposed State shall immediately after the day to he fixed as aforesaid, posterior to the first day of November, 1791, or at some convenient time, future thereto, be admitted into the Federal Union.”
The assent of the Congress of the United States was obtained by an act approved, February 4th, 1791, (2 Biorens’laws U. S. 191) and the government of Kentucky as a State, was by the convention its constitution, and the assent of the General Government, commenced on the first day of June, one thousand seven hundred and ninety-two.
That the State of Kentucky succeeded to, and possesses the political sovereignty and dominion oí er the territory assigned to her, with all the powers of an independent State, Legislative, Executive and Judicial, (except as restrained by the articles of *451 separation contained in the act of Virginia, of 1789, and by the Federal constitution,) with all the powers of self-government which belong to a nation, is clear. That she possesses the powers of taxation of the lands, and of penalties and forfeitures, subject to the exceptions contained in the compact, is clear from the provisions of the fourth article, and from the very nature of sovereignty and political government. The enumeration of certain restrictions upon her powers as a State, excludes all other restriction not so enumerated, nor falling within the exceptions.
Claims in f'0U'r°ve.fsy, fr°m Virginia, °
Oefendantin-s¡ssj^he Kentucky0 were inter-dicled N *he compact from enacting the' laws for pro-“J). veying.
Third article, of tlie com~ security of private rights, rive(i from Virginia,
The private rights and interests in controversy between the parties here litigant, were all derived by warrants issued from the land office of Virginia. The claim of the complainant was by an entry of June, 1780; the interests of the defendant is by warrant and entry, before the separation; of consequence these private rights and interests were equally within the protection and security intended by the compact.
The defendant does not claim under, or by virtue of anyforfeiture actually accrued, he derives no claim by an entry made after the time when, by the last act of Legislation of Virginia, a forfeiture ior want of appointment of an agent and notification, could or might have been incurred, it is not pretended that the surveyor ever did give notice personally, or by advertisement, sb as to forfeit the entry of Campbell for non attendance on the surveyor according to notice; but the argument is, that the Legislature of Kentucky were interdicted by the terms of the compact with Virginia, from enacting the laws for prolonging the time for surveying.
If there be any such prohibition, it must be sought in the third article. The subjects treated of in that article are, “all private rights and interests of lands within the said district, derived from the laws of Virginia, prior to such separation;” the end proposed, is their validity and security, the means proposed are, a pledge of faith by treaty, that they shall “remain valid and secure under the laws of the proposed State, and shall be determined by the laws now existing in this State.”
Construction of the com- ' pact.
Stipulation in the compact for the rights to land, iloes not bieílfrri»ht shalíbe^e-stroyed, that thereby the ise effect?
Distinction Hcam” n*'3" vaüTrights!
In settling the true meaning of the compact, ss now drawn in question by the survey of the complainants of 1796, there are four sources for information.
I. The words of the article;
II. The interpretation which the high contracting parties have themselves given by their Legislatures;
III. The judicial opinions heretofore, given:
IV. The political and Legislative facts, under which the compact was made, and the consequences therefrom resulting.’
I. The words used to signify the intention of the parties are, “all private rights and interests of lands, within the proposed district, derived from the laws Virginia, prior to such separation, shall remain valid and secure under the laws of the proposed State,” The rights and interests of both Part’es litigant, were derived from the laws of Virginia prior to the separation. The rights and interests' of both fall within the description; both are entitled to be equally protected, and equalty secure. Tci destroy the one, to protect the other, would violate the direct intent of the article. A stipulation for the validity and security of all, cannot fairly mean a contract for the destruction of some. It cannot fairly be made an imperative command for the destruction of that right, which was legally derived from the law’s prescribed to each, thereby to uphold tiiat interest which was illegally derived under the laws of Virginia. A stipulation for validity, security and protection of all, cannot mean a command for the destruction of tile better claim, that thereby, the invalid and vague piay he unmolested.
The distinction between private rights, and pub-lie rights and interests is obvious, it is visible in the compact, it exists in the very nature, and is inherent in the very body, of every political society. .As soon ás society 'is organised into a government, the distinction between the private rights and interests" of each individual, and the public rights *453 arid interest of the whole is created; the latter are given the better to protect and secure the former. The private rights and interests are subordinate and subservient to the public rights and interests.
injustice of retrospective iaws'
Operations of ^entma bear upon conflicting interests, but] insist on gov-eminent executing a pen-fpifu“e orchis adversary, that he may Profit-
These words determined36-by the taws yiow existing laws in force at the date of the enaot" ment, 18th Dec. 1789, and not the laws winch Virginia might enact between that time and the separation.
*453 That conflicting private rights and interests ought to be determined by the laws under which they were respectively derived; that the Legislator should abstain from retrospective Legislation with design to retroact upon conflicting private rights and interests, .to help the one and destroy the other, are principles so morally fit and just, that no wise man will withhold his assent, when the propositions are stated abstractedly from considerations of public policy, and the general welfare.
It is true that the fair exercise of the moral pow-prs of government, do incidentally and cQllaterally bear upon conflicting private rights and interests, A just system of revenue may cause a private interest and claim to land, to be exposed to' sale for the taxes, or for an instalment of the State price due ancl unpaid, or to forfeiture for non compliance with the revenue laws; and one holding' a conflicting in-ferest and claim, may thereby be benefited, by purchasing in the conflicting interest at a reduced price, or by the forfeiture. "'' But if the Legislature in' their wisdom and clemency, shall forbear to urge the sales or the forfeitures, the individual conflicting claimant, has no such private right and interest in the expected sale or forfeiture, as that he may urge the sales and forfeitures, or impeach the faith of the government for (be exercise' of clemency arid forbearance. Penalties and forfeitures are public rights, not private and individual rights; they áre private and interests, calamities and misfortunes to those who fall under the burthen and loss.
The latter words of this article are, “and shall be determined by the laws now existing in this State.” The operation of the words “now existing,” is supposed to exclude the power of the Legislature of Kentucky from prolonging 'or modifying the laws of Virginia, in relation to the forfeiture of entries for want of appointments of agents or attornies in the proper counties. The period of time to which *454 the words “now existing” have reference, is the first subject in order, and will aid in deciding upon the character and clasilication of the laws of Virginia intended to be preserved, and those of Kentucky intended to be excluded.
The act of Virginia, in which these words are contained, passed on the 18th of December, 1789; by this act the terms and articles of compact proposed, were to be submitted to a convention, to be elected by the people of the district in the ensuing May, and to hold its session, commencing on the 26th of July ensuing, at Danville,; that act required, and enacted by its second section, “that full opportunity may be given to the good people of exercising their right of suffrage, on an occasion so interesting to them, each of the officers holding such elections, shall continue the same from day to day, passing over Sunday, for five days, including the first day, and shall cause this act to be read on each day, immediately preceding the opening of the election, at the door of the court house, or other convenient place;” the first section having previously apportioned the representatives to each county, and required the elections tobe hoklen on the respective court days of the several counties in the district. This convention was to approve or reject the propositions contained in this act. It cannot be supposed that the people were invited to give their assent by anticipation, to future laws, and to rivet those laws upon all persons deriving rights and interests of lands from Virginia. It cannot be supposed that the convention did assent to fix, and render immutable, laws to be subsequently passed by the Legislature of Virginia. Such a tyranical proposition would have been a disgrace to the members of a Legislature who made it, and an insult to the people to whom it was addressed. The convention were not invited to render immutable, laws to be passed subsequently to their deliberations and ratification of the terms proposed for separation. The act itself speaks in the present, not in the future. The act itself speaks of laws “now existing;” that lime must refer to the period at which the act took effect and operation as a law; it spoke then, and as of that date.
Clasification of the laws intended to ¡mmutabieby the compact —tbestipu-termination6" by the laws then existing, a?iucledtode-courts of justice in the tn.al °f th®se ^nd interests6 inland,
The next consideration is the classification of those laws of Virginia, which were intended to be thus fixed and immutable in all time to come, and unalterable but by the mutual assent of the two States. The proposed relinquishment and cession by Virginia, of her eminent domain and political sovereignty, to a new and independent State was the cause, private rights and interests of lands the subjects, the stabilitv and security of those private rights and interests, the end intended; these are visible in the face of the compact. In ceding a por-tion of her territory, and consenting that a new State should be erected with political power and sovereignty over that territory, Virginia owed it to her own character as a State, to moral justice and good faith towards her own citizens, to the citizens of the United States, and to foreigners, whom she had invited by her act of 1779, to purchase her wastelands withjn,the territory proposed to be ceded, to take care of those private rights and interests of lands which had been derived under faith of her laws, and by her invitation, A punctilious regard to those high moral duties, is to be found in the stipulations contained in this third article as well as in the fourth, fifth and sixth. To accomplish the end proposed, the terms proposed by the act of 1779, contains a direct pledge of faith and agreement on the part of the proposed State, that these private rights and interests shall remain valid and secure under herlaws; it contains specific stipulations calculated to fortify that security, such as those contained in the after articles. After the faith of thenew State was pledged to respect private rights and interests, alter a previous stipulation, that all rights and interests of lands derived under the laws of Virginia, should remain valid and secure under the laws of the proposed State, this stipulation respecting their determination by the .then existing laws of Virginia is introduced. This looks to the decisions of the judicial tribunals in controversies between those conflicting private rights and interests, all of which were to remain valid and secure under the laws of the proposed State. Experience in granting out the lands on the *456 éastern waters, under the colonial government, had proved that where individuals Were left to their choice of waste lands, with liberty to cause the surveys to be made at their own discretion, conflicting interests would arise. In selling out the lands on the western waters, the fact was Well known in 1789, that multiplied conflicting interests had arisen. The records of the land office, and of the courts of justice proved it; the representatives of the several counties in the district of Kentucky, as well as others composing the Legislature of Virginia in 1789, well knew it. That the neW State would violate her plighted faith, by legislating between individual interests, was not to be presumed. This stipulation, for determination by the law's of Virginia then existing, must allude to decisions of the courts of justice in the trials of these private rights between litigants. Complaint or dispute arising between the two States, concerning the meaning or execution of the articles, are by the eighth article to be determined by a special tribunal to be instituted mutually by the States. In the eighth article the word “determined” is again used, as previously in the third article, to mean decided, adjusted, settled.
Right of Kentucky to forfeit the lands, in which the private rights and interests are protected by the compact for neglect of cultivation or improvement .recognized in the compact.
They were the laws under which the rights and interests in lands were acquired under Virginia and which defined the náture and extent of the interest, and. which are necessary to be considered, in adjudicating on such interests, are those made immutable by the compact.
*456 It is evident from the caiise of the compact, arid from several articles of it, that all laws which might bear upon and affect the lands held by individuals were not prohibited to the new State The fourth article treats of taxation, and forfeiture for neglect of cultivation or improvement; those public rights are therein admitted as belonging to the new State, and the Legislation on those subjects are qualified.
If all Legislation bearing upon individual rights and interests of land derived from the law's of Vir-giaia, was not prohibited, how shall the laws of Virginia then existing, be characterised, separated and distinguished from thpse laws which the State of Kentucky had rightful authority to enact? The cause of the compact, the subjects, the end propose ed, and the means adopted, must all be viewed in connection, in just governments, there are laws which from their connection with private rights *457 ,ancl:teirares of- property, are considered as having permanent effects; which effects every sovereign, acting as a moral agent, is bound not to violate, although the laws no longer exist; which, in the convulsions of empires, and amidst the clash of arms, are acknowledged, which even conquerors respect, which none disregard, but the tyranf v/hq feels power and forgets right, hese are the laws by which private property was acquired, and by which private rights and interests were vested; which, iff altered or abrogated, do not destroy those private rights, and to do s.o would shake the very foundations of property, qnd the distinction between me-«m and tuum. There were laws bearing upon the private rights.and interests of lands derived under the laws of Virginia; under faith of which individuals purchased; which prescribed and defined the nature and extent, and legality of those interests, which were appropriate and necessary to be considered in adjudicating upon the validity of those private rights and interests. They were the leading features in discriminating between right and wrong; the touchstones to which every private right and interest of lands lying within the proposed State were to be brought for trial. These laws Virginia llerself was bound to respect, even after they should be repealed. As the sovereign holding tlie dominion over the territory, she was morally bound to observe those laws as sacred to a certain extent; in ceding her rights of sovereignty,'' she was morally bound to stipulate for their observance to a certain extent; the validity and-security of private property depended upon them. As to laws of that class, no doubt can exist as to the intention of the compact, to render them permanent and immutable as evidences of vested right; but not permanent as to future rights. The joint consent of both States could not alter these, so as to give them a retroactive effect upon the rights and interests originating under them, without violating a principle which the sense of the American people deems sacred.
Powers of the government to waive or remit forfeit-uve and pon-fe¿tedbyatho compact.
*457 There were, however, other laws of Virginia, which, acknowledging the private rights and in *458 terests of lands derived from the State, required of the owners to perform certain acts in relation to those claims, as duties to the government; the bet-her to enable the government to guard and protect the public rights and interests. The performance of these duties to the public, were exacted under threats of penalties and forfeitures for failure, Laws of such character in all governments are mutable, the abrogation of such laws, or the relaxation of them from time to time, or the pardoning of of-fences, and remission of penalties and forfeitures, accruing or accrued under them, marks the clemency of the government, but is no violation of private right. Where no private person has acquired a vested right in the accrued penalty or forfeiture itself, by way of reward for his labour or industry in informing or prosecuting for the penalty or forfeiture, no difficulty can arise as to the power to remit; where no penalty or forfeiture has accrued, but may accure, no doubt can exist as to the power of the government to avert the threatened forfeiture by giving further time for the performance of the duty, for the neglect of which, the penalty or forfeiture is denounced. The power of remission, reprieve anti pardon, is inherent in every government; the legislature who created the law, by which a penalty, forfeiture or punishment for neglect of duty, transgression or crime, is to be inflicted, can prolong the time for performance of the duty, waive the penalty or forfeiture, or pardon the transgession or crime. In most governments of the States this power is also vested in the executive.
and"return of surveys, were antUhc^ro-iongations of the times fix-b°" that state as offensive to Acts of Virginia for expediting the private rights,
*458 By the act of 1779, for granting out the waste and unappropriated lands, every person for whom a survey was made, was required, within twelve months at farthest, after survey made, to return the plat and certificate of survey to the land office; and on failure, it was lawful for any other person to enter a caveat against the issuing of any grant to him. From 1781, down to the passage of the act proposing the terms of separation, the Legislature had, from time to time, given indulgence for returning plats and certificates of survey. The Legislature, as a system connected with her revenues, enacted the *459 law of 1784, before récited, for expediting surveys; this act was repealed, and another mode was substituted by the act of 1785; which was continued by successive acts of Legislation before recited. These laws, by the history of their various elongations before given, were considered by the Legislature of Virginia, as coining within her sphere of public policy, and to prolong the time for performance of the duties referred to in those acts, was considered by her as no offence against private rights and interests derived under her laws. The time for re* turning plats and certificates of survey,, and for-complying with the requisitions of the act of 1785, in relation to entries, had been continued each at the October session of seventeen hundred and eigli-. ty-eight, for two years; the time would expire in, the year seventeen hundred and ninety. Did the Legislature of Virginia mean to propose to the people of the district of Kentucky, that no further time should be given for the performance of the duties referred to in those acts of 1788?
“Now exist* ing,” in the 7th section of the compact, means existing at the date of the enactment by Virginia, December, 1789, and not at the consummation of ths compact, -
The convention h olden in July, 1790, in pursuance of the act of 1789, did ratify the compact proposed. The time at which the people of the proposed State should acquire the right of Legislation, was by the act of 1789, to be fixed, posterior to the iirst day of November, seventeen hundred and ninety-one. It was fixed by the convention, and by the assent of Congress to thé first day of June, seventeen hundred and ninety-two; Kentucky then became a State. By the third article of the compact, ‘‘all private rights and interests of lands within the said district, derived from the laws of Virginia prior to. such separation, shall remain valid and secure under the laws of the proposed State, and shall be determined by the laws r.ow existing in this State.” This compact speaks as oí its date in December, 1789. In determining upon these private rights and interests, all laws of Virginia then enacted, and appropriate to the validity and security of these private rights and interests of lands, are to be the rules of decision. All others not then in force, are excluded. Subsequent legislation of Virginia, as well as of Kentucky, must fee excluded from the *460 class of laws so alluded to, and fixed by the exprCs' sions “now existing.”
Description of the laws rendered immutable by the compact.
Defence of defendant, that the complainant’s ' valid and lawful claim liad not been forfeited by the government, that his illegal claim might be ■ made effectual.
The laws of Virginia then in force, under whicli those private rights and interests had been' derived from the State as proprietors, which "defined the tenure, which entered into the question of validity and legality of those rights, which composed a part bf Ihe very evidence in tlie deduction of right and. interest, ¿fid which constituted a part of the muni-ments of title, are certainly included within the guarantee ontained in the third article. All retrospective legislation by Virginia or Kentucky, whicli should attempt to declare, that right or interest which was valid and secure, because legally derived under the then existing laws, invalid and illegal, because not in conformity to. after 'enacted laws, would certainly be excluded.
But the argument for the dtíféhdáttts elites not Stop here. It is contended in their defence, that the legislature of Kentucky had no rightful authority to pass the law by whicli the penalty and forfeiture of the entry of Campbell was prevented, by'which his right and interest derived also under the laws of Virginia, and' coming within tlie pale of the compact, also has been preserved to him. The complaint is, that Campbell’s better private fight and interest, legally derived under the laws of Virginia, valid in its inception and' conformable to law, has not been forfeited, so that 'the vague and illegal claims of tlie defendant, not derived according to law but in contravention of it, may by the penalty and the forfeiture, become the better. The argument, in its consequence arid conclusion, tends to deny the legislative power of Kentucky and Virginia, after the passage of tlie act of 1789, to remit the penalties and forfeitures whicli were to accrue at the expiration of the time allowed by the elongating acts of 1788. Tt contends for the proposition that act of legislation of Kentucky, (and consequently of Virginia,) which in their remote and collateral consequences react upon grants derived from the State of Virginia^ are prohibited by thé compact.
Compact with Virginia f’-'L11-?/ , tucky from1' elongating *he acts giv-t^me^for sar-veying entries,
Can this be its meaning? Did the State of Virginia, by her act of 1789, and the ratification of the terms, by the convention in 1790, mean to divest herself of the power to continue further, the acts of 1788, in relation to the returning of plats and Certificates of survey into the Register’s office, and to the surveying of entries? Did the legislature of Virginia propose, and the people of Kentucky, through their representatives in convention, agree that no longer indulgence should be given than that containecl in the acts of 1788? Did the legislature and convention solemnly contract that the system of forfeiture instituted and threatened by the act of 1785, but not yet énforced, should fall with all its force in the year 1790, upon all who had not complied with its requisitions; and tKat neither Virginia nor Kentucky should have the power to prevent it? Did this third article adopt permanently the act of 1785, instituted by Virginia, merely as an auxiliary to her system of revenue? Did it debar the State of Kentucky from enforcing the improvement and cultivation of lands, by adopting a system of forfeiture in due season, notwithstanding the seenfi-ing concession of power in the fourth article. Is her poyrer of taxation, likewise seemingly conceded in tile fourth article, cut off by the third article? Did this third article exclude the power of Kentucky to pass the act of 1792, subjecting lands to the payment of debts, and fix irrevocably the Virginia system of execution by levari facias and elegit? Did it retain to Virginia the power of perfecting all inchoate interests of lands, and require all plats and certificates of "survey to be sent to the Register’s office in Virginia to be carried into grant? Did the State of Virginia by one fell swoop destroy all plats and certificates not returned to the Register’s office, and all'entries not surveyed, whose owners were not resident in the'appropriate county, at the expiration of the time allowed by the acts of 1788? Did the people of Virginia ancl the convention at Danville, thus mean to destroy the hard earnings of the people of the district of Kentucky, who had endured so many privations and toils, and had by ‘defending the settlements and conquering the covin- *462 try, deprived themselves of the time and means to have their entries surveyed?
Cotempora-neous exposi tion of the compabt.
Exposition of Die compact l>y the members of tito convention who adopted it, given in their enactment of the statute extending the time for surveying entries, at the next session, allowed effect in the construction of the instrument.
Act of Vir-sinia, passed nftci°the rieo-pie of Kentucky had ratífietHhend compact in convention, owners of en tries the far-" iher time of Í aveth1-1910 surveys exe-rated.
Tiie contemporaneous exposition by the parties to the compact, the recorded acts of those who were actors in framing and adopting the articles, negative the construction contended for by the defendants.
II. The interpretation which both of the contracting parties have given to the compact, immediately after it was ratified, before the State of Kentucky was organized, and immediately after, deserves great consideration. It was given by very many of the same persons who a.s representatives in the legislature of Virginia of 1189, framed the articles of compact; who as members of the convention held at Danville, ratified and adopted it, and as members of the legislature, passed the acts of Kentrucky referred to. The maxim is ucontempo-ráneo, axpositio est Jortisshnum in kge-n The mutual agreement and concurrence of the contracting parj ties in allowing to the instrument a particular meaning and effect, is the most satisfactory evidence of their intention and of the use and sense in which they employed the words.
The act proposing the terms of separation, passed on the 18th December, 1789; the convention was fi olden in Danville in July following, in pursuance diat acC diat convention approved and ratified the terms; the compact aud agreement was complete by the very terms of the act itself and of the aPProvaR die day was appointed when the new State of Kentucky was to have its station in the family of States. The legislature of Virginia, by compaci, had now a restrictive power over the district of Kentucky, as to some subjects but as to others, her power of legislating for the district yet roma*ned- In the session of November, 1790, after die previous ratification by the convention holden in July, the legislature of Virginia, composed of representatives from counties in the district of Kentucky, as well as from the other counties, and composed of very many of the same persons who had been actors in proposing and accepting the compact, passed the act allowing the farther time of two years *463 to fhe owners of entries on the western waters, to comply with the requisitions of the act of 1785, recit.ing in this last act, that .the continuing act, (of 1788) would expire during that session. This legislature did not construe the compact of 1789, as divesting the State of the power to prevent the forfeitures threatened by the act of 1785.
Act of Virginia, at the same session, allowing farther time to return plats and certificates of sur? rey.
Farther tipis turulata" and certifi-catcs by the aot of ’91‘
Act of Kentucky of >92, and after-wards continuing the time for returning plats and certificates of sur-
Early expositions by the Legislatures of Virginia and Kentucky, proof of the intention of the com-, pact.
At the same session, 1790, an act was passed, (chap. 14; sec. 1, p. 8 and 9; 1 Litt. c. 561,) reciting that the law authorizing the Register of the Land-office to receive plats and certificates of surveys, would expire on the last day. of December, 1790, “whereby their lands may be forfeited; for remedy whereof: Be it enacted by the General Assembly, That the further time of nine months, after the passing of this act, shall be allowed for returning the same, during which time the Register of the Land-office or his deputy, shall receive all plats and certificates of survey, although not returned in the time heretofore limited by law, and such lands shall not be considered as forfeited or liable to forfeiture on that account.”
In 1791, (chap. 4, sec. 1, p. 5; 1 Litt. 463,) the farther time of two years, to be computed from the period given by the act of 1790, was given to return plats and certificates of survey, “and such lands shall not be considered as forfeited or liable to forfeiture, any law to the contrary thereof notwithstanding.”
The legislature of Kentucky, by the act of 8th November, 1792, (1 Litt. L. p. 115,) and by various successive acts, (which are noted in the prelection 1 Litt. just quoted, and in 2 Dig. from p. 714 to 733,) continued the time for returning plats and certificates of survey.
These enactions of Virginia in 1790 and 1791, and of Kentucky in 1792, 1793 and in successive years, afford clear evidence that neither State expounded the compact as divesting the government of the power to grant indulgencies of time to perfect the inchoate rights originating under the laws of Virginia, by carrying them into surveys and grants.
Judicial decisions in favor of the power of Kentucky to extend the time for owners of entries to have them súrvej ed.
Kennedy vs. Bruce, 2 Bibb 371.
Kendall vs. Slaughter, 1 Mar. 378: touching the 3rd article of the compact.
III. The judicial opinions heretofore given, are to be found in the cases of Simpson against the Register, (Printed Decisions 256,) Kennedy vs. Bruce, (2 Bibb 371;) Kendall vs. Slaughter, (1 Marsh. 378-9;) Shipp vs. Miller’s heirs, (2 Wheat. 324-5,) and Miller’s heirs vs. M’Intire, (XI Wheat. 442.) The case of Simpson vs. the Register, does not discuss the question under the compact, but is an able commentary on the act of 1785.
The case of Kennedy against Bruce does not discuss the question on the compact; but a survey made in 1805, was adjudged to be in time, by force of the act of Kentucky pf 1797, and by virtue of the saving of that act.
In the case of Kendall vs. Slaughter, the meaning of the third article of the compact is discussed. The court said, “whilst the legislative enactments of this country, are by the compact, not permitted to affect the validity of those rights, we are of opinion, that instrument should not be construed so as to preclude the legislature from either regulating the mode of action, or limiting the time within which it should be prosecuted, for the purpose of asserting those rights.” Again; “That the legislature is not interdicted from regulating limitations, is moreover further evinced by the decisions of this court, in relation to laws regulating the making of surveys of land derived from the laws of Virginia. It will be recollected that at the time of the separation, according to the laws of Virginia, for a failure to appoint agents and attend the making of surveys, the owners of lands were subjected to a forfeiture of their claims; and although many entries, which by the laws of Virginia, would have become forfeited for a failure to appoint the agents &c. as required, yet in consequence of the prolongation of th,e time by the statutes of this country, surveys have, in many instances, been made, and in the various cases which have been presented for the adjudication of this court and growing out of the authority of the laws of this country, not the slightest suggestion against the right of the legislature to pass such laws, is to be found,”
Shipp vs. Miller: Supreme Court United States, 2 Wheaton 324-5, decided on the act of Ky. of 1797.
Miller’s heirs vs Mclntire, Supreme Court United States, XI Wheaton 442, decided on the construction of the acts of 1785, and acts elongating that act, and of the compact with Virginia.
The case of Shipp vs. Miller, is expressly decided upon the authority of the act of Kentucky of 1797. Miller died in 1796, and in 1804 this entry was surveyed; at the time of Miller’s death, and also of the survey, some of his children were infants, (2 Wheat, p. 324.) The distinction between the statutes of limitations, and of statutes of forfeiture is noticed to show that to take the case out of the statute of limitations all must be under disability; but in case of forfeiture, the disability of a part of Miller’s heirs was sufficient. The opinion proceeds: “The statutes of Kentucky, allowing farther time to owners to survey their entries, is made with a different aspect. It is to save a forfeiture to the government, and acts imposing forfeitures, are always construed strictly as against the government, and liberally as to other parties.” The case of Kennedy vs. Bruce is cited, and the survey adjudged to have been in time and the claim sustained.
In Miller’s heirs vs. M’Intire, this same survey, before adjudged in the case of Shipp vs. Miller’s heirs, again came before the Supreme Court of the United States. Miller’s heirs claimed under the prior valid entry; M’Intire claimed under a posterior entry and elder grant. M’Intire contended that Miller’s entry was forfeited for want of a survey made in time, according to the laws of Virginia, and relied on the compact between Virginia and Kentucky, to defeat the authority of the laws of Kentucky elongating the time for making surveys; that Miller’s entry being forfeited, his elder grant must prevail. Miller’s heirs stood upon their prior, special entry and the authority of the acts of Kentucky and Virginia, in remitting and preventing forfeitures, The Chief Justice, Marshall, in delivering the opinion of the court, 'slates a difference among the Judges. “Some think a second entry is not authorized, and that no title can be acquired under it. A grant, therefore, that is founded on it, is totally void, and the grantee cannot hold the land under it, even after the original entry became forfeited. The land, on such forfeiture, became vacant, and it was competent to the legislature to grant it bv an original warrant, or to revive or to contin- *466 ue the right held under it. Others are of opinion that a subsequent entry is not absolutely void, but has been considered as a valid appropriation oí the land, unless it shall be encountered by a better title. That the removal or extinguishment of that better title leaves the holder of a grant, founded on a junior entry, the true legal owner of the land it purports to‘convey; — but they think also that this mere possibility could not attach itself absolutely to the land, until it became vacant by, the laches of the person who had made the first appropriation. Till such vacancy actually occurred, the power remained with the Stale to give farther time for perfecting titles. Limitations of time in this respect, were intended chiefly for the benefit of the State, as it was not the course of the government to tax unpatented lands. The State, therefore, might grant indul-gencies in this respect, without giving just cause of . complaint to a person whose interest, if he had any, was potential, not vested, was rather a pre-emption to the exclusion of others' subsequent to himself, than a positive acquisition which could in any manner interfere with the rights of the person who had made a previous appropriation. Without determining either of 'the points on which this difference exists, the court is of opinion, that Miller’s heirs are within the savings of the act giving farther time to the owners of lands to survey the same and for returning plats and certificates to the Register’s office, passed in the year 1797.”
This opinion of the Supreme Court expressly affirms the authority of the act of Kentucky of 1797. The difference of opinion, consists in an incidental point, whether if Miller’s entry had been forfeited, it would have enured to the benefit of M’Intire, so as to prevent the government from granting the land to another, or whether the State might have regranted it to the prejudice of M’Intire. But both opinions unite and concur in affirming the power of Virginia and Kentucky to release the forfeiture, the compact of the States notwithstanding. The authority of the act of Kentucky is expressly affirmed by all, without settling their differences, upon the grounds that it was competent to the legislature *467 to continue the fight of Miller’s heirs or to- give farther time for perfecting, titles.
Hoy’s heirs vs. McMur-ray, 1 Litteli. 367, against the validity of the acts extending the time for executing the surveys, reconsidered and not law.
Summary of the argument and authority in support of the validity of the acts of Kentucky extending the time allowed for executing surveys and returning the plats and certificates.
In the case of Hoy’s heirs vs. M’Murray, (1 Litt. rep. 367,) a different opinion was delivered, but that opinion was suspended, by a petition for rehearing, according to the rules of the court. Upon return to a certiorari it appeared that the complainant had dismissed his bill as to that party, so that the question was not before the court, and without either affirming or denying the correctness of the former opinion, the petition was, therefore, overruled, (1 Litt. 370-1.)
It appears, therefore, that the legislature of Virginia, at the ensuing session after the ratification of the compact, and the legislature of Kentucky at their first session, affirmed the legislative power to extend the time for returning plats and certificates of survey to the Land-office, and for making surveys, the articles of the compact notwithstanding. That construction has prevailed for six and thirty years, under the sanction of both parties to the compact, and of the judiciary of Kentucky, and of the Supreme Court of the United States. It is based Upon a plain distinction between private rights and interests, and public rights and interests. It affirms the validity and security of private rights and interests, and leaves those rights to be determined and adjudicated by the laws which gave and sanctioned them; it leaves to the purchaser of lands under the laws of Virginia, every inherent and direct interest, right and estate, according to the laws of Virginia, subject only to those duties, contributions and obedience to the moral power of just legislation, which every land holder owes to the government under which he holds, and from which the laws and authorities for his protection in the use and enjoyment of the land must spring. It places the security of private rights and interests, as well against conflicting claims of individuals, as against the hands; of the government, upon the foundation of immunity from retrospective laws, as far forth as such exemption can consist with the necessary powers of government. It consults the validity and security of private rights and interests, by applying to them *468 those laws uniter which they were derived and perfected, declaring those laws as the permanent and immutable standards of right and wrong, in determining the conflicting and clashing interests, subjecting the owners only to those indirect and consecutive effects of laws, hot aimed at the destruction of individual interests, but directed to the preservation of tbe whole, and flowing from the exercise of powers inherent in all governments, from the exercise of powers necessary to the existence of government itself, and confided for the purposes of establishing justice, ensuring tranquillity, defending all rights and interests, and promoting the general Welfare and happiness.
O'onseqnen-'ces of the construction of the com-^ate ti,e a‘ot¡T
*468 The construction contended for by tbe defendant, if it prevailed, would defeat the operation of the act of Virginia of 1790 and 1791, as well as all the subsequent laws of Kentucky, extending the time for saving entries, and plats and certificates of survey from forfeiture. It claims for the defendant a private right and interest in a public statute, threatening penalty and forfeiture for not complying with the duties to the public. It converts that which is a public right and interest, into a private right and interest. It claims a stipulation for the validity and security of all, as a stipulation compelling the forfeiture and destruction of part. It claiuis that Kentucky was compelled to execute a penal statute of Virginia, originating in a desire to increase her revenue, and connected with the then prevailing system of Virginia, not to tax unpatented lands. It denies to Virginia and Kentucky the power to mollify the statutes of penalty and forfeiture, or to grant indulgence of tii.ee for complying with its requisitions, and demands the execution of the statutes of penalty, in relation to the making of surveys, and in respect, of returning plats and certificates to the Register’s office, against the will of both States. It claims security for the defendants, by the remote, collateral, and accidental effects of the rights and interests of others.
If this doctrine of remote and accidental benefit, is given into, as a criterion for adopting the laws of Virginia, existing in 1789, and for excluding all *469 Subsequent legislation on the same subjects, it is not to be seen as yet, what laws of Virginia existing in 1789, are to be included, and what laws of Kentuc-ley, made or to be made, are to be prohibited. The train of consequences which would follow from thence; from the destruction of the laws allowing the return of plats and certificates, and further time for surveying, and of other laws of Kentucky, and from the limitation thus imposed upon the power of legislation of the State of Kentucky, can be better imagined than told. The enumeration need not be begun, for the end connot be foreseen.
Cause and P“rP“e of intCrpreta°tion.1 '
IV. The political and Iegislathre facts, at the time of the compact, and the consequences thence following, if the extensive interpretation contended for on the one hand, or the restrictive interpretation on the other, be adopted, will aid in fixing the true meaning of the parties.
Before we progress under this head, a recital of some of those rules for interpretation of treaties, compacts, conventions and contracts, which being founded in reason and good sense, have received the approbation of nations, may be of great assistance. If the ideas of men were always distinct and perfectly determined, and they had, to make them known, expressions and terms, clear, precise and susceptible of but a single meaning, nothing more would be necessary to understand their, true meaning, but to understand the language. In concessions, contracts, laws, treaties and conventions, it is impossible to foresee and express all the particular cases that may arise. True interpretation consists, in making in all the particular cases which are presented; a just application of that which has been before decreed or provided in a general manner. Contradictions and inconsistencies, either real or seemingly so, will present themselves with respect to the different terms and provisions, and it is the office of interpretation to reconcile and shew the parts that ought to betaken, and the sense in which the terms and expressions are to be applied. Self-interest will seek to take advantage of the imperfection of language, and head to its purposes, the ambiguities and obscurities of the geueral terms *470 used by the contracting párties or by the legislators. Rules founded on reason and authorized by the law of nature, diffuse light on that which is obscure, define that which is uncertain', and frustrate the attempts of perverted self interest.
Rules of interpretation. —Words are to bfe understood according to their propriety.
Rules of interpretation applicable to the compact ■with Virginia.
The rules which m:iy have bearing more directly on the subjeciunder consideration, áre to be applied to a sentence of ambiguous signification, in a treaty designed to form anew State out of a part of a preexisting State. The desideratum is to distinguish between the letter and the design, between the'Writing and the meaning of the writing, so as to apply the intent of the parties to the compact, signified there in general terms, to the particular case which has arisen.
These rules have reference to the subject matter, the effect, the circumstances and connexions, as the principal heads from whence the interpretations are to arise; (Grotius, Book 2, chap. 16;) words are to be understood according to their propriety. Therefore Grotius recites the story told by Polybeus of the Locreans, and condemns the shift made use of by them, as foolish and pitiful; when having put some mould into their shoes and concealed some garlick heads Om their shoulders, they swore to keep the articles of the treaty “as long as they carried those heads on their shoulders, and trod on that earth;” and then threw the earth out of their shoes and the heads of garlick from their shoulders, as if by such poor means they were absolved from their treaty.
The general rules of interpretation which have more direct application to the compact under consideration, are the following:
1. “When we manifestly see what is the sense that agrees with the intention of the contracting parties, it is not permitted to turn their words to a contrary meaning. The intention sufficiently known, furnishes the true matter of the convention, of what is promised and accepted, demanded and granted.” (Vattell, Book 2, chap. 17, sect. 274, p. 230.)
*471 2. “We ought always to give to the expressions the sense most suitable to the subject, or the matter to which they relate; for we endeavor, by a true interpretation, to discover the thoughts of those who speak, or of the contracting powers in a treaty.” (Ib. sect. 280.)
3. “Every interpretation that leads to an absurdity, ought to be rejected; or in other words, we should not give to any piece a sense from which follows any thing absurd; but to interpret it in such manner as to avoid absurdity.” — “We call absurd not only what is physically impossible, but what is morally so; that is, what is so contrary to reason, that it cannot be attributed to a man in his right senses.” (Ib. sect. 282; Grotius, Book 2, chap. 16, sect. 6, p. 355.)
4. “We ought to interpret obscure or vague expressions in such a manner, that they may agree with those terms that are clear and without ambiguity, used elsewhere, either in the same treaty, or in some other of like kind.” — “In foci, while we have no proof that a man has changed his mind or manner of thinking, it is presumed his thoughts have been the same on the same occasions: so that if he has any where clearly shewn his intention with respect to any thing, we ought to give the same sense to what he has elsewhere said obscurely, on the same affair.” (Vattel, Supra, sect. 284, p. 235; Grotius, Sup. sect. 7, p. 355.)
5. “We ought to consider the whole discourse together, in order perfectly to conceive the sense of it, and t.o give'to each expression, not so much the signification it may receive in itself, as that it ought to have from the thread and spirit of the discourse.” (Vattel, Supra, sect. 285.)
6. “The reason of the law or the treaty, that is, the motive which led to the making of it, and the view there proposed, is one of the most certain means'of establishing the true sense; and great attention ought to be paid to it, whenever it is required to explain an obscure, equivocal and undetermined point, either of a law or of a treaty, or to *472 malte an application of them to a particular case. (Vattel, Supra, sect. 287, p. 237; Grotius, Supra, sect. 8, p. 855.)
Application; of the rules " of interpreta» tion to the questions on the compact.
*472 7. “We use the restrictive interpretation to avoid falling into an absurdity. A man bequeaths his house to one, and to another his garden, the only entraáce into which is through the house, it would be absurd to suppose he had left the latter a garden, into which he could not enter; we must then restrain the donation of the house, and understand it was given only upon condition of allowing a passage to the garden. The saíne method of interpretation must, take place,' when a case is presented, in which the law or the treaty, according to the rigor of the terms, lead to something unlawful;” (Vattel, ib. sect. 293.) “Seneca says there are exceptions so clear it is unnecessary to express them;” (Vatt. p. 240.)
9. “If the subject or the matter treated of will not allow, that the terms of a disposition should be taken in their fall extent, we should limit the sense according as the subject requires;” (Vattel, sect. 295, p. 241.)
10. “One infallible token that there ought to be an exemption is, when to adhere precisely to the letter, would be unlawful, that is, would be repugnant to the law's of God or nature. For such things having no power to oblige are necessarily to be excepted; (Grotius, Book 2, chap. 16, sect. 26, p. 366.)
11. “Another token of restriction shall be this, when to stick close to the letter, is not absolutely and of itself unlawful, but when upon considering the thing with candour and impartiality, it appears to be grievous and burthensome. And this either ip respect of the condition of human nature absolutely, or in regard to the purpose and thing in question, compared with the end and design of the engagement;” (Grotius, ib, sect. 27, p. 366.)
These rules of interpretation condemn the Pla-toe who having agreed with the Thebans to restore the prisoners, after killed, them^ and restored their *473 dead bodies. They condemn the Roman general who agreed with Antioohus to restore half his vessels, but caused each vessel to be -cut in two.' They condemn Perricles, who promised safety to such of the enemy as should lay down their arms; but after, by a play upon the word (/emww,) used to signify arms, put to death those whose cloaks were fastened with iron clasps. They condem the conduct of Dido, who landing on the African coast, purchased of the inhabitants-as much land as could be covered by a hide, then cutting the hide into small throngs, encircled a large piece of their territory, on which she erected a citadel, and excluded their laws and government. They will equally condemn every interpretation so made, as that the end conflicts with the cause and intent, or by which the parts of the convention are made discordant, or the parties made to desire things which ill-agrce with each other, and with the main object and design, or made in such manner, as that a convention for establishing a new State, shall, out of ambiguous expressions, deprive the proposed State of the accustomed powers and subjects, belonging to the legislative department in every well ordered government, and essential to the peace and happiness of the people.
Absurd consequences of the constructions of the compact which would make invalid the acts in question.
The illustrations of these rules, given by the learned authors from whose writings they are extracted, convince the mind, that they are fixed on the immutable foundations of reason, nature, truth, and good faith.
Without making a direct application of each particular rule to the appropriate subjects to which they respectively apply; it is my intention to show that the construction of the compact, contended for in the defence, tends to limit the powers of self-government, which was the plain and direct object and design of the compact, in a manner unlawful, as contrary to the principles contained in the declaration of independence, and contrary to the sentiments declared in the declaration of rights by Virginia; that it leads to absurd consequences, repugnant to the other parts of the convention; and would be an unlawful abridgment of natural rights,, and *474 essential powers of government. That the restrictive interpretation should be applied, so as to confine 'the sense to particular laws of Virginia, by which she had'declared her rights of territorial jurisdiction and domain, and required all former and future rights and interests of lands to conform to her laws, then existing, to the exclusion of all other sovereigns, states, potentates, nations or tribes, who claimed, or had claimed, the territorial jurisdiction, right of soil, or domain, over the district of Kentucky; that so restricted, the utmost harmony of design and consequences will be the result; the effect will be suited to the subject, the circumstances and connexions.
Objects of the compact yrith Virginia.
Political doctrine recognized at the adoption of the compact by'the parties to the instrument.
Extract from the declaration of independence.
' The compact was proposed and ratified by the people of the State of Virginia, then a‘member of the American Confederacy. The design was, to give to the people of the district of Kentucky the rights of self government, as anew State to be admitted into the Union under the Federal Constitution, then adopted, arid in operation.
The doctrine of the divine right of rulers, and of non-resistance and passive obedience of the people was exploded. The power of any generation or description of men, in any country, of binding and controling posterity forever by any compact commanding how the people should be governed, and who should govern them to the end of time, had been abjured and denied by Virginia, and by the people of the United States.
The American declaration of' independence had proclaimed ‘‘these truths to be self-evident, that all men are created equál, that they are endowed by their Creator with certain unalienable rights;'that among these are life, liberty and the pursuit of happiness. That to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed; that whenever any form of government becomes destructive of these ends,- it is the right of' the people, to alter or abolish it, and to institute anewgovernment, laying its foundation on such principles, and organizing its powers in such form as to them shall seem most-likely to effect their safety and happiness.”
Declaration, of Virginia |>er ng 1 s‘
power an(j liberty of the. government not thereby affecting pri-interests by vetrone- ’ tj'on.
The declaration of Virginia, in the first, second and third articles of the bill of rights prefixed to her form of gevernment, is not less emphatic and explicit, as to the natural and unalienable rights of man; the first article declares that all men “have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posperity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.” The third article declares that, “a majority of the community hath an indubitable, unalienable and indefeasible right to reform, alter or abolish” their government.
The American sentiment had become embodied in State and Federal Constitutions, that retrospective laws, to make and punish offences, or to change the force and tenure of private rights and interests, or to impair the obligation of contracts, were highly injurious, oppressive and unjust.
The compact was made by and between j.eople who recognized those truths, and those principles, In construing this compact then, neither the unalienable rights of self government which belong to the people of Kentucky of the one party, nor that good faith and regard for private rights and interests, exempt from retrospective legislation, which was pledged to Virginia of the other party, should be forgotten. The right of soil and dominion were ceded by Virginia, and accepted by Kentucky, under the limitations and qualifications specified in, the compact.
In deciding upon this third article, and selecting the laws of Virginia as fixed and unalterable rules, of decision, and in excluding the legislation of Kentucky, there are two extremes equally to be a-, voided. By the one, the just and necessary powers of self government may be denied to the people, of Kentucky; by the other, the rule of selection and exclusion may beso loosely drawn, as to undermine the foundation upon which private rights and in-ferests were intended to be placed for stability and security. The line maybe so drawn as to rivet up *476 on Kentucky, laws destructive of, and to exclude others essential to, the well being and happiness of the people. It maybe so far extended as to run into the odious and exploded doctrines, that a certain body of men may make a law proper and convenient for them, as they supposed, but that there does not exist in the nation, nor ever can, a power to alter or abolish it, but by convulsion or revolution; that those who come after them cannot alter, modify or repeal it, howsoever grievous and oppressive; that the dead may so bind the living by a law, as to deny to the living and all succeeding generations forever, the means competent for the purposes which their occasions and happiness require. if the people have an unalienable right, in pursuit of their happiness, to alter or abolish one government and institute another, they must equally have the unalienable right to alter or abolish a law made under such government; the major includes the minor proposition. Prudence must dictate the abolition or changes in the frame and constitution of the government, or of the laws. Whence can the State of Virginia, or the State of Kentucky, or the people of 1785, or of 1789 and 1790, derive an authority to bind themselves and all succeeding generations, by a law of such moral force and obligation, that it cannot be altered or repealed, or new modeled, but by breach of good faith and integrity? It is tobe looked for in the character and effect of the law compared with that universal sentiment which nature has engraved in the heart of every man, a desire of property, a desire to separate and distinguish that which belongs to him, from that which belongs to his fellow man, and to preserve that which is his own. The rights of private property are essential to the happiness of man. Respect for the laws under which vested private rights were acquired, is a moral sentiment, common to all civilized people of all nations. It is founded in the very nature and existence of man; it is a law of his nature. The moral force and efficacy of laws from which private rights were derived, which vested, defined and explained, the state and extent of the rights, are permanent, as eviden *477 ces of the right to the thing. This moral efficacy extends beyond the territorial jurisdiction of the government which made the law, it continues after the law itself is extinct, or repealed and has ceased to have legal effect as a Law existing; it continues and runs with the thing, as evidence of the right of property; as such it has force and respect in foreign countries; it is respected in abolishing one government and instituting another; it survives the wreck of revolution, of war ahd of conquest, unless the laws of the conquerors to the conquered are dictated by brutal force and rapine. Respect for tile rights of private property, and the moral effect of the laws under which they were derived, is a sentiment not peculiar to this or that age, or generation, nor to this or that country. Conquerors may violate this sentiment, but they cannot eradicate it from the hearts of men. To the moral effect of such laws, all future generations are presumed to assent, because they are morally bound to assent, unless some superior moral duty demands and justifies dissent. By force of this moral sentiment, retrospective laws aimed at the destruction of private rights and vested interests, are denounced as generally oppressive and unjust, and as only to be tolerated under urgent and imperious circumstances of public interest. The destruction of private rights and interests is, prma facie, an enemy to human happiness.
Extremes,'1 of denuding the state, and impairing its essential powers, and tolerating retrospective laws destroying private rights and interests in lands derived from Virginia, to be a-voidod.
By selecting the laws of Virginia, under which private rights and interests of lands are derived, and which by reason of the moral force due them, ought to command permanent respect and assent, as the rules' of decision, to the exclusion of any law of Kentucky, which should impeach or destroy them, the two extremés will be avoided. Kentucky will have as an independent State, full possession of the unalienable rights of self-government, with her just powers to consult the true happiness and interests of the people by appropriate Legislation; but prohibited from that retrospective Legislation, which is denounced by the moral sense of mankind, as oppressive and unjust.
Enumera tion of the effects of <a liberal interpretation of the clause in the compact, requiring; the private rights and interests m lands derived from Virginia, to be decided by the laws then in force, and the denial of the power of the government to alter the laws.
This third article, requires a liberal and generous construction, with the application of the distinction before noticed, between the surviving efficacy of a repealed law, and the actual operation of a still speaking law, and with a cautions eye to the powers of Legislation to be retained for the just and necessary rights of self government, and those which are to be abandoned, as interdicted and classed under the head of retrospective Legislation; otherwise, evils may arise as multiplied and grievous as those which escaped at the opening of Pandora’s box.
For instance the statute altering the course of descents, and the statute of wills, enlarging the power of devising lands, took effect, not until the first day of January, 1787; a very great number of vested rights by descent and devise were acquired before that time, very different in effect, from the operation of those two statutes, and yet those statutes, were the operative laws of descent and devise existing in 1789. It will not do to rule these private rights and interests by the literal application of the words, “and shall be determined by the laws now existing in this State.” Again, the statute of Kentucky, have facilitated the authentication of powers of attorney and deeds, and conveyances by femes covert, of their estates and inheritance, and of relinquishment of dower, the clerk's of courts are authorised to take the acknowledgement or proof of deeds in their offices; deeds may be admitted to record by pro.of of two witnesses instead ofthree; lands have been subjected to sale by fieri facias, a mode of division and conveyance of lands held in conjunction, has been instituted. If the words “secure,” and “now existing,” as used in the compact, are to have such construction as to draw after them the laws of Virginia, existing at tire date of the compact, as the means of safeguard and protection, and fortification; if the laws for derivation of title or interest from the Commonwealth of Virginia, are not the only laws of Virginia which are rendered permanent, but all the laws of Virginia for transmitting such title or interest, from individual to individual, *479 and for securing its use, possession and enjoyment, and guarding against disseisin, dispossession, forgery, &c. if the laws of Virginia, of limitation, conveyance and execution, Sec. then existing, are to be rules of decision, to the exclusion of the laws of Kentucky, then indeed, there will be sad confusion; the State of Kentucky can apply no remedy; her powers will be too limited for the rightful purposes of self government; and the floodgates of litigation will be again opened. For the compact includes all private rights and interests derived from the laws of Virginia, prior to the separation. The whole territory north of Green river, and a great part of that lying south, was entered and surveyed under the claims derived from Virginia; and since 1792, the derivation of claims from individual to individual, has been pursued according to the statutes of Kentucky.
Definition of the laws in f°rce in Vir-d'ateofrihe0 enactment of tlle statute the com^-ici; intended to be embraced t^ee *“se pact «and" shall be tie-grained by existingSjn°W this state.”
The words of this article of the compact are, '‘all private rights and interests of lands within the said district, derived from the laws of Virginia, priorto such separation, shall remain valid and secure under the law's of the proposed State, and shall be determined by the laws now existing in this State.” This article consists of but a single sentence, but its sense and meaning must be ádjudg-ed by the facts and circumstances then existing. -It may be explained by putting it into two sentences instead of one. “Ail private rights and interests of lands’” — “derived from the laws of Virginia-prior to such separation,” — “shall be determined by the laws now existing in this' State ” “All private rights and interests of lands” — “derived from the laws of Virginia — prior to such separation — shall remain valid and secure under the laws'of the proposed State.” The derivation of title from the State of Virginia, the legality and validity of the claim as against the State, as the paramount sovereign and source of all' private rights and interests of lands, must be tried by the laws of Virginia, existing in 1789. All the laws of Virginia for engaging, selling or disposing of lands within the district of Kentucky, which ever had an existence in Virginia, and which she herself meant to acknowledge as lawful sources of *480 claim against her proprietary rights, were in matter of fact then existing laws in 1789.
■Extrae (s from the act of 1779, constituting the substratum of the land law f Virginia.
The force of the expressions “now existing in this State,” and the reasons for introducing them into the compact, will be illustrated by reading the act of 1779, (Chan. rev. p. 90, chap. 22, 1 Litt. law. p. 390.) The preamble recites, “whereas the various and vague claims to unpatented lands, under the former and present government, previous to the establishment of the Commonwealth’s land office, may produce tedious and infinite litigation and disputes, and in the meantime, purchasers would he discouraged from taking up lands upon the terms lately prescribed by law, whereby the fund to be raised in aid of the taxes for discharging the public debt, would be in agreat measure frustrated; and it is just and necessary, as well for the peace of individuals as for the public weal, that some certain rules should be established for settling and determining the rights to such lands, and fixing the principles upon which legal and just claimers shall be entitled to sue out grants, to the end, that subsequent purchasers and adventurers may be enabled to proceed with greater certainty and safety,” — Be it enacted See.
The first section, recognizes various descriptions of surveys, made and to be made under certain proclamations of the king, and governors of Virginia, &c. &c. as valid, and declares,1 “that all surveys of waste and unappropriated lands, made by any other person, or upon any other pretence whatsoever, shall be, and hereby are declared null and void.” The section then, requires of recognized claims, certain compliances with the rules and regulations of the land office, and upon returning their plats and certificates to the land ofice, with the authentic evidences of the rights whereon they were founded, were to be entitled to a grant for the same “in manner and form hereinafter directed.”
Sec. 3. regulates the claims under the charter, and ancient custom of Virginia, upon importation rights as before limited; treasury rights, and rights under proclamation warrants, who had not fixed, and located them by surveys, as therein before di *481 rected, should be entitled to warrants, entries and grants, in manner directed by the act of assembly* for establishing the land office, and ascertaining the terms and manner of granting 'waste and unappropriated lands, upon producing authentic evidences of their rights within a limited time; — importation rights not proved in a certain manner, and within a limited time, were declared null and void. The fourth section, declared all orders of council or entries for land, in the council books except so far as they had been respectively carried into surveys in the manner before mentioned in that act, “shall be, and they are hereby declared null and void; and of no effect,” except also the entry, or order of council, for the dismal swamp, which was to be laid before the general assembly for their further order. It further declared, that no claim to land within the Commonwealth, for military services, founded on the king of Great Britain’s proclamation, shall thereafter be allowed, except a warrant had been obtained from the governor of ‘Virginia, as before mentioned in said act, or where such service was performed by an inhabitant of Virginia, or in some corps raised in the State, in which case the party, upon due proof, should be en-tiled, upon producing certificate thereof from the court, be admitted by the register of the land office to a warrant, entry and grant in the manner prescribed in said act.
The act of May, 1779, (chan. rev. 103,) declare ed all former sales or deeds, and all future sales or deeds, made or to be made by any indian or indians, or indian nation, for the separate use of any person or persons, should be void.
The purchase which was made by Richard Henderson and company, from the indians, of the country between the Kentucky and Tennessee rivers, was abrogated, and a small portion thereof confirmed tp them. All purchases of the indians were prohibited by the XXI article of the constituition of Virginia, but on behalf of the public, and by authority of the legislature.
Object of tlie parties in using the terms “now in force in this state” was to exclude all claims to land, not sanctioned-by the act of 1779, and subsequent laws.
Object was •not to em-descents'”"1 wills, of alienation, nor -rU'
In fine, the State of Virginina, by her constitution, and by the legislative acts, had declared all rights anti interests of lands, not recognized by her, and her laws, since the revolution, null and void, thereby intending to assert the proprietary rights and domain, which she acquired by the revolution and definitive treaty of peace, making the laws of Virginia, after the revolution, the only source of derivation of rights and interests of lands, and declaring all pretensions not derived from her, as the fountain and owner of the public domain, absolutely null and void. To prevent the evils alluded to, in the preamble of the act of 1779, before quoted, to exclude the purchasers from the indians, and the interests which might be asserted under the king of Great Britain, the State of Virginia had laid the foundation by her own laws. All pretended derivations of title, not recognized by her acts of assembly since the revolution, were abrogated; all these laws, and the laws for acquiring rights or interests derived from her laws, were actually existing on the 18th December, 1789. To secure against all other derivations, not so recognized, the words in the compact, “shall be determined by the laws now existing in this State,” were introduced, s.oas to bring the derivation of title within the Jaws of the State since the revolution, and to exclude ail the proclamations, orders and entries in the council books, under the colonial government, and all pretensions founded on the indian claim of title.
All the appropriate laws for these great purpos-cs, for recognizing, conceding, settling and acquir-jng private.rights and interests, and perfecting them by grants, were actually existing in 1789. But the laws by which private rights and interests were to pe derived, from individual to individual, had un-dergone great changes between the opening of the .'land office and the year 1788. The common law .of descents-had been repealed, and the statute, directing very different rules, took effect in January 1787; the statue of wills had been changed, and the statute of frauds had been enacted to take effect in January 1787; the right by survivorship was abol-ighed, by an act of 1786, and. au act to remedy abus- *483 és in the manner of selling lands for the payment of public taxes had been passed in 1788, (chap. 62, p. 32.)
Consequences which fol-eralcoLtruction of the compact denourme^he acts extend-mg the time e™tl.s”veyins en nes'
From these alterations, let the mind survey the confusion and desolation of estates which must en-sne, if this doctrine, that the laws which existed in 1789, are to be the sole, and unaltered and unalterable rules, by which all derivations of private rights and interests, as well from the State to the citizen, as from citizen to citizen, are to be determined. The words now existing, exclude prior as well as subsequent laws. Repealed laws are excluded as imperatively, as those after made. If the penalty ancl forfeiture laws, for not surveying, or appointing agents, then existing, are included, so must be the limitation laws, and so must be the law of descents, of severance, of joint rights, of execution, &c. &c. All'these, as they existed in 1789, to the utter exclusion of the previous laws upon the same subjects, as well as subsequent laws, must necessarily follow in the train, if we but advance the classification of the laws of Virginia, under the words “now existing,” beyond the era of derivations from the State as proprietor to the citizens, as grantees and purchasers. Cross but that line, and the rubicon is crossed. All repealed laws of Virginia, and all the laws of Kentucky, must be excluded from the determination of the private rights?- and interests; only the laws existing and having the force of laws on the 18th December, 1789, can be regarded. Take the law of descents according to alteration from the common law. How many military rights, settlement rights, preemption rights, and treasury rights were originated before 1787? How many of these were actually patented before 1787? How many patentees died after their patents actually issued, butbefore 1787?
To these-estates the eldest son or eldest brother, or other proper relative, was sole heir, according to the common law. The heirs by the common law; have entered upon the estates of which' their ancestors repectively died seized, claiming to be sole proprietors of the estates of their respective anees* *484 tors; have parcelled out, sold, devised and granted them, and they are now divided and subdivided. But by the law of 1789, all the children male and female, inherit equally. Under that law of descents, existing in 1789, they may bring their writs of right, grounded on the seizen of their ancestor; he dying seized, fifty years is the limitation to writs of right in such cases by the law of Virginia, existing in 1789; the Kentucky statutes are excluded, the Virginia laws of descent, and of limitation, as existing in 1789, must be the laws for determining the cases; the whole number of children, not the eldest son, are heirs by the same rule, and by the same rule they must recover. This is but one class of evils that must ensue. Add ta these, the other consequences from the same law of descents, and from the other laws of devises, &c. the exclusion of the limitation laws of Kentucky, and the execution laws &c. &c. passed since 1789, and the general confusion, uprooting of estates, and multiplied liti-gations cannot be foretold. The demoralizing effects of such general litigation and insecurity of landed estates of a whole nation of people are certain and inevitable; public happiness is the sacrifice; society would be convulsed. Where would be the remedy under such construction of the compact. There would be none but by asserting the natural and unalienable right of every age and generation to act for itself, as free to consvdt its happiness as the ages and generations which preceded; as declared in the first and second article of the declaration of rights by Virginia, and also in the American declaration of independence.
^ovetheex-tent of th(T consequences be embraced the con-siruciion a-valkliV*'of the acts extending the t¡me for exe_ cuting str-veJ3-
*484 But it may be said, that this is pushing the construction further than has been contended by its ad-vocaTsj that limitations to the time for surveys, and to the time for bringing actions, according to the laws existing in Virginia, in 1789, as being the ru*es °* decision, and the exclusion of the occupant an(l limitation laws of Kentucky as no rules, are the only results contended for. These effects are but ^le forerunners. If the principle by which such results are produced, be conceded and established, the other consequences which have been alluded *485 to, must likewise follow, from the same Cause. Tíie laws above mentioned, are but particular examples under the general principle asserted. Establish the major proposition from which those specific subjects of the conclusion are deduced as consequences, and all other subjects comprehended under that general proposition, must likewise be the consequences. The question whether the laws of Virginia of descents, devises, executions, and so forth, shall run along with the laws of Virginia, for limitation of surveys, and limitation of actions, as existing in 1789, and be included together, depends upon the quantity of that major proposition. The laws of Virginia, “now existing,” that is, existing in 1789, compose the subjects of the middle term, which connects the two extremes of the general proposition asserted, and the consequences deduced. The middle term “now existing,” is common to, and may be affirmed of the laws of limitation, descents, devises, executions, and is common to every law of Virginia which can be truly affirmed to have existence in 1789. The laws of Virginia, which shall be comprehended' under the general proposition, are the subjects to be sought for, and affirmed or denied, as belonging to the middle term “now existing,” from which affirmation or denial, such laws are to be applied or denied, as the rules by which the questions of validity and security of the private rights and interests are to be determined. The quantity or number, and classification of these laws so to be taken, as the rules of decision, depend upon the words “derived from the laws of Virginia;” the word “derived” is the key, which is to be applied to unlock the mystery. Are all derivations of interests, as well between the State and the citizen, as from citizen t© citizen, to be included, or only some of them? Are laws prescribing the rules of derivation between the State and the citizen, to be selected as the position to be affirmed, and laws for derivation between citizen and citizen to be denied, or are all the laws of derivation, of both classes, between State and citizen of the first class, and between citizen and citizen of the second class, to be affirmed as the general proposition for the laws which are the rules of decision *486 and determination. Let us take the second class ás included, as well as the first; and trace the conclusions. Ail derivations of rights and interests, from citizen and citizen, are determined by laws. All derivations shall be determined- by the laws “now existing in this State” — the laws of descents, of devises, of executions, arc laws for derivations of rights and interests from citizen to citizen; therefore, derivations of rights and interests, from citizen to citizen, shall be determined by the laws of descent, devise and execution “now existing in this State” — but the common law as to descents is not a law “ now existing in this State,” therefore, the derivation by descent, shall not be determined by the common law) — but the statute of descents, which took effect- in January, IKS'?, is the law of descents “now existing in this State,” therefore, the statute directing the course of descents, shall be the law to determine the derivation of rights hy descent. The same series may be applied, with like truth, to the laws of devise, survivorship, executions, the statute of frauds and various others. The extravagant consequences of which, and the absurd consequences thence resulting, have been before noticed, and need not bo repeated, to show the error of such conclusion.
Laws and claims to land intended to be excluded by the clause “laws now existing in this state.”
The quantity of the general proposition, if taken hy the derivations of rights and interests, from the State to the citizen, will end in conclusions perfectly true and just; for every law proper for such determination, was existing in full force, on the 18th December, 1789. Such general proposition will exclude all‘derivations under the Royal government, hy proclamations, orders of council, entries in the council books, Indian titles, and every other declared void by the constitution and laws of Virginia, leaving all private rights and interests declared valid or recognized by any law of Virginia, from the revolution to the separation, in full vigour. Nothing short of the absurd consequences which have been noticed, will satisfy the defence made by the defendants! To include the laws of Virginia for limiting surveys, the proposition must be assert-: ed so generally and extensively, as to embrace limi- *487 iafions of actions, derivations of ¡rights from citizen to citizen, from whence many other consequences equally follow, as extravagant and contradictory .to right and justice.
Argument on the context of the clause.
If the expression, “laws now existing,” be confined to the Jaws prescribing ifie derivation of rights and interests, from the State to the citizen, it will conform to the meaning of .the other words immediately following the word derived, to-wit: “de-i’ived from the laws of Virginia prior to such separation;” as the State, of Virginia was to grant no new rights, b,ut only .to complete existing engagements under existing laws. The words “private rights and interests, derived from the laws of Virginia, prior to such seperation,” appear to have been employed to express the direct and immediate .concession and sales by the State. The words, “from the laws of Virginia,” in connexion with the words, “private rights 'and interests,” and the words, “prior to such separation,” mean the same, .as if “State” was substituted!;! place of “laws;” as if it were £iderived from the State of Virginia.” The State could only concede and sell private rights and interests of lands through the laws by which she speaks and contracts for herself. “Private rights and interests, derived from the laws of Virginia prior to such separation,” are used to express direct and primary derivations from the State, not subordinate derivations under the laws.” “From the laws of Virginia;” the word “from,” is used to denote reception from the State, as the fountain of private rights, the lord paramount and proprietor of the public rights, and demesne lands, and in contradistinction to subordinate derivations under the laws of descent, devise, &c. “From,” as used in .this place, does not mean the same as “under.” The word “under,” is introduced afterwards, in a signification evidently different, viz: “valid and secure under thelawsof the proposed State.” Change the expression thus, shail remain valid and secure from the laws of the proposed State, and the difference between “from” and “under” will be striking.
Consistency of the construction in favor of the validity of the acts.
Acts of Virginia of 1785, and of ’88, proposing terms of separation, both contained the provision for the determination of the rights and interests in lands derived from Virginia, by the laws now existing in that state: arguments on that fact,
This construction will produce no contradiction between laws repealed, and laws existing, in 1789, and subsequently. All private rights and interests within the district will be brought to the proper tests for determination; those derived from the State to the citizen, to the test of the laws existing in 1789, derivations from citizen to citizen, to the appropriate laws before or after 1789, arid all will be well ordered. The respective laws of Virginia, and of Kentucky, which did exist, and did not exist, at’ successive periods, can be then appropriately applied, to each, respective case.and fact, in the course of subordinate derivations, whilst the great fountains of rights and interests, as existing at the date referred to by the compact, will be appropriately and exclusively applied to each, particular right and interest.
These several acts proposing terms of separation, were enacted at successive sessions, by the legislature of Virginia, the first in 1785, (sess. acts, chap. IX. p. 11,) the second of 1788, (chap. 81, p. 47,) the third of the 18th December, 1789, which last was adopted. In each, the third article is identically the same. In the proposition of 1785, the third article uses the expressions, “now existing in this State;” the convention was to have been held in the succeeding year to consider the propositions, with power to appoint a day, subsequent to the first day of September, seventeen hundred and eighty-seven, on which the authority of Virginia and its laws, under the exceptions contained in the act should cease, with the same proviso, that Congress should assent to the admission of the State proposed, into the Union. The eight articles in the act of 1785, correspond with the eight articles of 1789; in all particulars, except as to the time in the articles, fifth and sixth, fixed for future locations of warrants, and for the commencement of the right of Kentucv ky to dispose of the surplus lands. At the same session of 1785, the common law rule of descents was altered, the statute of devises was altered, enlarging the power and extending it to after acquired lands; the statute of frauds was enacted; the statute of conveyances was enacted with important alter *489 ations, estates in fee simple were declared to be created without the use of the word heirs, unless a contrary intent was expressed, or intended. All these statutes to take effect on the first of January, 1787, before the proposed State was to have existence. These acts would have been excluded, (if that proposition had been adopted by the convention,) under the operation of the construction now contended for, by the expressions laws “now existing.” Virginia could not have intended to rivet the common law of descents, and the laws anterior to those statutes on the proposed State; if she did not, then the expressions, “now existing,” were not used in the extended sense contended for by the defendants. The use of these words in the act of 1785, is another evidence, that they were used in reference only to the laws of the State prescribing the derivation of rights and interests from (he State to individuals, and not to the laws for derivation between citizen and citizen. They were used to exclude royal and colonial rights and'interests of lands, and Indian titles not recognized bv Virginia as good and valid.
Effect of the words remain secure.
The question, is a right or interest in land valid against the state! shall be determined by the laws in force in 1798,
Again, the words are, “shall remain valid and secure under the laws df the proposed State;” “remain” has the meaning of continue; if valid when tried according to the laws existing in 1789, they shall continue to be valid. Shall remain “secure under the laws of the proposed State” — can these expressions exclude laws of the proposed State? Do they not designate the laws of the proposed State as the means of security; as the tenure whereunto the holders of these rights and interests are to look for protection and security, as to the superior to whose eminent domain the whole district was proposed to be transferred?
The first question as to these private rights and interests is, are they acknowledged by tlxe laws of Virginia as valid against the State. This question is to be decided by the laws existing in 1789, not by colonial and royal acts, orders of council, purchases of Indians, &c. declared null and void by the acts of Virginia. ”,
Whether the claimant is entitled to the right or interest thus derived from the stale, may be determined by laws repealed prior to ’98, or subsequently én-.acted.
In what the security or rights and interests in -land consist.
The next question in order, after shewing the validity of the grant or concession by the State is, has the-grantee transferred it, so tlirt the claimant stands fairly as the right owner of the claim so valid as against the State. This question may be decided by laws existing before or after 1789, according to the nature of the derivation, whether by descent or devise, or contract, and according to the time of such descent, devise or contract. Here laws repealed, and laws not then enacted, when referredto the date of 18th December, 1789, must be brought in aid to determine the question according to time and fact combined. The questions as to the security and protection given to the actor, or the reus, by the laws, have their appropriate places in the order of trial and these must be tried by the appropriate laws.
The security of rights and interests depend upon the organic structure, and the wisdom and policy of the laws of that government, under which the .property is hoklen. Upon these depends the difference between the security for rights and interests under the government of Turkey, or in the United States. The security of land estates depends upon a combination of various elementary parts, having mutual action and reaction. A government eager to impose, and unrelenting in the exaction of, penalties and forfeitures of private rights, is of less security than one slow to impose and indulgent in the exaction of them. The preservation of archives, records, documents and muniments of title, by appropriate laws to guard against loss and destruction of title papers, is another ingredient contributing to security. The wisdom and policy by which laws are directed in their enaction, and administered by the appropriate departments and channels, is of very great importance in producing security; the system of imposing and collecting the revenues, the powers given to the officers of the revenue to sell real estate for defalcations or alleged defalcations, is of great importance in consulting security or insecurity. The laws for organizing the courts of justice, and for carrying into execution their judgments and decrees, and prescribing the duties of the sheriffs or other appropriate officers, are of very great con *491 cern as to security or insecurity. In the trials of private rights and interests, the security or insecurity, depends greatly upon the time for limiting ac-lions, and thereby securing the repose of society against stale and dormant claims, after the memory and evidences of facts have been lost or destroyed. These subjects, among many others, which belong to acknowledged powers of government, act very forcibly upon private rights and interests. Wise and politic regulations upon these subjects combined, tend to a high degree of security; weak, imprudent and indigested laws upon any one or more of those subjects, tend to insecurity; perfection is to be sought by applying the lessons of experience, to amend and reform, from time to time. The preservation of the public archives, the enrolment of private title papers, and statutes of limitations, are of the means for consulting the security of private rights and interests. The limitation of actions is intended to guard against ancient claims, whether well or ill founded in their origin; and to secure against the machinations of dishonesty, when attempted, under the advantages attendant upon lapse of time, loss of papers and death of witnesses; (Clementson vs. Williams, 8 Cranch. 72 74; Shipp vs. Miller’s heirs, 2 Wheat. 324—5; Richards vs. Maryland, Ins. Co. 8 Gran. 91; Prevosl vs. Gratz, 6 Wheat. 497, 504.)
Principle of t!le statutes yons^nd" bars and presumptions by laPS0 oftira<r'
The limitation of actions is not peculiar to this or that nation, it is not confined to courts of common law, but is adopted by courts of equity, as an equitable principle. Presumptions are indulged by judges and .jurors, from length of time, where the statutes of limitations do not strictly apply.. The-reason is elegantly and forcibly expressed by Lord-Chancellor Erskine, in substance, thus: Not that judges and jurors are to believe individually in such-cases, that there has been, a surrender, acquittance, payment, release or other discharge; but the legal presumption holds the place of particular and individual belief. Mankind, from the infirmity of their nature, and the necessity of their situation, must have recourse to some general principle, for the preservation of their rights and their property, to take *492 the place of individual and specific belief in mattefs of antiquity. Therefore, from the weakness and infirmity of man, and of all human tribunals, in judging'of matters of antiquity, general presumptions are raised, became the means of creating belief or disbelief, are obscured or lost by time, and these legal presumptions ¡tro substituted in place of belief, which, in recent transactions, is the result of judgment acting on evidence.
Laws ofJimi-tiiüons and proscription, foundeirin the law of nature, ami recognized by national law.
Vattel derives the laws of limitations from the law of nature. The introduction of the rights of property, (he says,) is approved by nature, as being for the advantage anti happiness of the human race. But it would be absurd to say, that, domain and property once established, the proprietor can acquire thereby, any right to introduce disorder into human society. Such would be the right of entirely neglecting the thing that belongs to him, or leaving it during a long space of time, and coming at length to deprive an honest possessor of it, who has perhaps, acquired it by burthemsome conditions, received it as an inheritance from his father, or as a portion with his wife, and who might have made other acquisitions, had he been able to know that his title to this was neither solid nor lawful. Far from giving a right to such negligence and abandonment, and of after usucaption, the law of nature prescribes to the proprietor the care of what belongs to him, and lays him under obligations to make known his right, that others may not be led into an error; nature secures to him his property-on those conditions, if he neglects it long enough, to endanger the rights of others, in being permitted to reclaim it, the law of nature will not permit him to reclaim it. The right of property is not so extensive, that it can be absolutely neglected during a long time, notwithstanding, all the inconveniences that may happen to society by the proprietor resolving to use it according to his caprice. The law of nature orders all to respect this right of property in him who possesses it, because it is for the peace, safety and advantage of human society. For the same reason nature requires, that every proprietor, who, for a longtime, and without just reason, *493 neglects bis right, should be presumed to have entirely renounced and abandoned it. “The absolute presmnption does not here signify a conjecture about the secret will of the proprietor; but a maxim which the law of nature ordains, should be considered as true and stable, and this with a view of maintaining peace and order among men.” “Nothing can be more equitable than this rule. If the plaintiff was permitted to prove his property, he might happen to bring proof that, to appearance, was extremely evident; but would only beso, from the loss of some writing, or some witness, who might have shewn how he had lost or conferred his right.” (Vatt. book 2, chap. 9, p. 174.) “it is impossible to determine by the law of nature, the number of years required to found a prescription, (or limitation;) this depends on the nature of the property disputed, and the circumstances of the case.” (p. 175, sect. 142.) The same principles are maintained by Grotius, (book 2, chap. 4, p. 174 &c.) He declares it as an avowed maxim, established by the consent of all nations, that public, as well as private possessions, are in a long course of years, so secured and confirmed, that they can never be recovered. Tacitus considers, the reviving of old pretensions as an impertinence. Cicero,’ (second book of offices,) asks, “Is there any reason why lands that a man has been possessed of for many years, should be taken from him?”
Necessity of limitations of bars°ofctoims by lapse of hme, concur-^'lions^ 1
By the concurrent testimony of the wisest men, in various nations, and in different ages, statutes of limitation, and the rules of prescription, are considered as founded in nature, and reason, and necessary to the repose and security of society. Hence an argument is drawn that the statute of limitations of Virginia, existing in 1789, is adopted by the compact, under the words, “shall remain valid and secure,” and “be determined by the laws now existing in this State;” that to alter the statutes of limitations of Virginia, is to alter the security agreed upon in the-compact; that it would be retrospective legislation, impairing the obligation of the compact, and therefore contrary to the constitution of the United States.
Law of nature fixes no precise time when claims must be assorted ; that is in the discretion of the legislative authority of of each state.
Principles on which the legislative authority establishes the ccrtam.peri-ods of limitation and prescription.
Periods of limitation different ¿ov g-rmnonts in different cases‘
The precise determination of the time allowed for prescription anti limitation, cannot be determined by the law of nature, it is not the same in different nations; although it has some foundation in the law Of nature common to all men; yet the precise time is fixed in each State, according to its views of policy, and necessity; and it serves as a rule only within the nation which enacts it; the precise time in each country depends upon the legislative will.
That the security of private rights would be es" sentially impaired by a total repeal of the statute of limitations, or by fixing the period of limitation so long as to leave the facts done in one generation, to be tried by another, after the witnesses were mostly gone, or their memories impaired, cannot be denied. Insecurity may also lie produced by shortening the times to such speedy and instantaneous pursuit of remedies for causes of action, as to escape and baffle the ordinary vigilance of prudent men, watchful of their.interests, so as to encourage wrong doers. Security is promoted by taking a valuable mean between the two extremes, in this, as in all concerns in life. What that golden mean is, depends upon circumstances, upon opinion, and experiment, it is a question of policy. Different nations have adopted different periods of limitation, and the same nation, different periods on the same subjects at different stages of their existence. A limitation suited to an old, long settled country, whose government is founded on a landed aristocracy,'would not be adapted to a new country, where the lands were principally in forests, and covered with conflicting surveys. In the same country the period of limitation is varied by the subject matter from which the cause of action arises.
In England, the limitation to some actions is so long, as to produce hut little practical good. Sixty years is too long; it leaves the cause of action alive a^íer í*le witnesses io die facts are dead. The limitation to writs of error in England, is twenty years; the Congress of the United States have prescribed to their courts the limitation of live years, for writs of *495 error, in some of the States it is less. T3ie Congress of tiie United States have prescribed a limitation of eight years to suits on marshal’s official bonds; to crimes and ofienees, that the indictment be found in two years, or in three years, &c. according to the nature of the crime or offence. The States of North Carolina and Tennessee have the limitation of seven years to controversies respecting the titles to lands. In our own State the limitation to actions on conflicting surveys, is limited, in certain cases, to seven years, in other cases, the periods vary according to the subjects of suit. In most States and nations the periods prescribed for personal actions, is shorter than that prescribed for real, actions; and these have been varied at different ages of their political existence. The limitation to writs of error in this State was formerly five years, it is now’three years. These examples, out of many, suffice to shew that different nations, and the same nation under different circumstances, vary in tlieir prescriptions, according to the difference of subjects, circumstances, times, and policy. The period of limitation is therefore a subject of legislative discretion. Plaintiffs may think the time prescribed too short, when likely to be barred, defendants may think it too long; and plaintiffs, who under the process of the court, are put into possession, may in their turn think the limitation too short, if assailed by some other conflicting claim. It belongs to the wisdom of the legislature to prescribe the rule.
Statutes of limitation may be retrospective, and by which they may bo justified.
_ Whether the statute varying the rule of limitation already prescribed, is or not an act of retrospective legislation, depends upon the manner and effect of the enactment. A statute to operate by time past before its enactment, and to apply a bar to actions not then barred, or to remove a bar from actions then barred, would undoubtedly be an act of retrospective legislation, only to be justified by extraordinary circumstances; an act of justifiable retrospective legislation is to be found in the statute excepting certain periods of time during the revo Jutionary war, out of the time for limitation.
Where the ■ statute is retrospective, and where not.
Security of the private rights and interests in lands, provided for in the compact, was stipulated for, under the laws of Kentucky, and not the laws of Virginia, to be perpetuated hero.
But a statute operating, by time to run and be accounted after the enactment, and upon actions thereafter to be brought, is not an act of retrospective legislation, whether the time be shorter or longer than that before prescribed. The power to enact limitation laws, is an appendage to every sovereignty, incident necessai’ily to the power of legislation, and the exercise of it not less necessary to the repose and happiness of society. The denial of such power to the State, should not be drawn from implication and by construction.
That the security guaranteed in the compact, is to be under the laws of Kentucky; and not by carrying, with the private rights and interests derived from the State of Virginia, all the laws of that State contributing to their security against wrong doers; that the security intended, is not to be by fixing these laws of Virginia, as covenants annexed to the land and running with it, so as to exclude all the laws of Kentucky upon the same subjects, seems to be the necessary, result of the expressions “shall remain valid and secure under the lam of the proposed Slate.'''1 That penalty and forfeiture laws, and limitation laws, are not the laws included under the expressions, “now existing,” nor under any of the expressions in the compact is demonstrated, by tracing the absurd consequences to which the principle, by which those particular laws are to be embraced, would lead. Can the words “secure under the laws of the proposed State,” carry the laws of one State, (not involving the validity of right, but the security against individual wrong doers,) into the territory and government of another, to the exclusion of the authority of the government which the whole compact from beginning to end, proposed to erect and establish? Can the words “secure under the laws of the proposed State,” take away the power of the proposed State to make laws? Can they demand, as a fortification for security, that the system for courts of Virginia, then existing, shall be continued under the laws of the proposed State? That the laws of descent, devise, conveyance, limitation of actions, the act to remedy abuses in selling lands for payment of the public taxes *497 with its safeguards and wholesome regulations, shall be carried into the proposed State, and fixed permanently to the exclusion of her laws? If I promise another that he shall remain secure under my roof, can that other claim to impose upon my household his own domestic regulations, to the exclusion of mine, as fearing otherwise he would not be secure? As public records, documents and evidences upon which private rights and interests of land in Kentucky are based, the laws of Virginia must ever be received, but they ceased to have the am thority of laws within the State of Kentucky, as soon as she willed it. To Virginia we must look as the great fountain of right and title before the separation; to her laws we must look for the evidences of private rights and interests, authorized and conceded by her; to her laws we must look for the title of Kentucky, to the lands belonging to her public domain. To the laws of Virginia and of Kentucky, respectively, we must look for descents, devises, conveyances and alienations from man to man, according to the appropriate periods. To the laws of Kentucky, we must look for actions and defence, if these rights are invaded. All these rights and interests are holden, subject to those general and necessary powers of government which are to be exercised for the general good, which subsurvicncy is a.condition implied in all grants and concessions, and is described by political writers as the eminent domain of the government.
Description of the laws of 1789, by ■ which the rights and interests of land, derived from Virgin^, ia, shall be determined, not embracing laws of limitation nor other such statutes.
The result of this Construction of the compact will be, that ail private rights and interests will be valid, and tried by the laws existing in 1789, which are proper for determining whether the claim is good and valid, as legally derived from the government itself; every appropriate law for derivation of right between citizen and citizen, will be applied at its appropriate period of time, and to its appropriate use. There will be no conflicting of jurisdictions, no clashing of laws; all private rights and interests, derived from the government, according to the laws prescribed for disposing of the public domain, will be valid against the government; all sub-prdinate derivations, whether by this or that mode, *498 permitted or acknowledged bylaw, will remain valid ngainst the State, secure as vested rights arid interests, protected by the laws of the land; and the same measure of equal justice will be administered to all, as far forth as the fallibility of human tribunals will permit. These vested private rights and interests, will be secure against retrospective laws aimed at the destruction of private rights of property, by the solemn pledge of good faith, under which Kentucky received the rights and powers of government, as a separate nation of people, secured moreover, by that general interest and power of legislation, which is directed and controled by a well organized government, and by public sentiment. The State of Kentucky will be left in possession of all just and necessary powers of legislation for consulting and pursuing the general welfare and happiness, which Virginia possessed under her own State constitution, and that of the United States-; the same good faith which Virginia owed to purchasers from her, Kentucky owes; the same obligations which Virginia was under against impairing private rights and interests, Kentucky is likewise bound by.
Government has necessarily the power of appropriating private property to public purposes against the will of the owner— making just compensation therefor.
It is not sufficient to urge in favor of the extern sive interpretation of this article, that otherwise all private rights and interests will be unprotected from the legislative power of the proposed State, and that rights vested may be divested at the will of the legislature. It is not to be presumed, that a legislature will arbitrarily ¡gid capriciously pass laws not urged by the interests and benefit of the whole community, to deprive a citizen or citizens of vested rights and interests in private property. Some of the most necessary acts of legislation, are founded in the principle, that private rights must yield to public good. Roads are run through private property. The lands of individuals may be necessary for forts, arsenals, light houses and other public bindings. If the owners refuse to accomo-date the public voluntarily, they must be constrained. Justice consists in making compensation in such cases. The State cannot subsist, or constantly administer public affairs in the most advantageous *499 taanner, if it has not the power of disposing, on fit occasions, of all hinds of property, subject to its authority. (Vattell, book 1, chap. 20, sect. 244; Grotius, book 1, chap. 1, sect. 6, p. 4; Bull and wife vs. Calder and wife, 3 Dallas, 386.) The design and good of civil society necessarily require, that the natural and acquired rights of each member should admit of limitation several ways, and to a certain degree, by the authority of the government. It is better ever for private men, that the State in general flourish, though they themselves do not thrive in it, than that they should flourish in their private affairs, and the public suffer. For let a man’s private affairs be never so prosperous, yet if his country be lost he must perish with it. That which is the preservation of States, is the care of the public good, and that which destroys them, is the minding only one’s private advantage; therefore it concerns both the State and private men to prefer the interest of the public to that of particular persons.
Definition oí the powers of government and of the right of eminent do* main.
"That moral power which is called a State, necessarily demands three things: 1st, Consultation about public affairs: 2d, The establishment of the magistrates: 3d, Judgments. A State must be a body that has the power of enacting and repealing its own laws, making its own magistrates, and creating its own tribunals. It must have the legislative, the executive and the judicial powers of government. The power of consultation, or the legislative power of consulting, the public good, by enacting and repealing laws, necessarily comprehends that eminent domain which a State has for public purposes over the citizens and their property for public use. Without the possession of this power, called by political writers the eminent domain, the operations of government in the just pursuit of public good and happiness, the great ends of society, the powerful springs which put all in motion, would often be obstructed, and society itself endangered. Those who argue against the existence of such a power in the State, argue against the existence of the State as a government having its just and equal station in the great family of States.
Abuse legislative powers may be subject to, no argument a-gaiust their necessary existence.
Summary and conclusion of the argument on the construction of the compact.
It is no argument against the existence of thd power, to say it may be abused; that if the State of Kentucky may pass a limitation law different from that which existed in 1789, it may limit the time to a day or an hour. The same argument may be used against the power of taxation, because the legislature may impose a lax of twenty shillings in the pound; and so of various other powers equally necessary. To argue from the possibility of abuse, to the non existence of the power, is to argue against all the powers of government; for they are all liaable to be abused. We must confide power, and repose a salutary confidence that it will not be abused. The safety against abuse, consists in so laying the foundation of the government, and so organizing its parts as to watch and guard against the abuse of the powers confided, “it is our consolation,” (as Judge Iredell truly said, in the case of Bull and wife vs. Calder in the Supreme court of United States, 3 Dall. 400,) “that there never existed a government, in ancient or modern times, more free, from danger in this respect, than the governments of America.”
Under a sense of the momentous consequences involved in a just construction of the, compact between the two Slates; I have considered the question proposed by the defence founded on the compact. in doing this, I have been necessarily led to the consideration of consequences resulting from die principle, or general proposition, from which the particular consequence was claimed by the defence. The truth or falsehood of a proposition is to be demonstrated by the truth or falsehood of its consequences. I have alluded to the political rights as declared and acknowledged, and to the legislative facts, under which the compact was proposed and adopted. Various claims had originated under royal proclamations, orders of council, and entries in the council books before the revolution; the Indian title had been made pretence of purchase from them, which, together with vague and undefined claims under the colonial government, were likely to produce tedious and infinite litigation; these considerations, and others recited in the act of Virgin- *501 la of 1779, induced the legislature of Virginia to declare all such claims null and void, except such as were conformable to the acts of 1779, “for adjusting and settling the titles of claimers to unpa-tented lands under the present and former government, previous to the establishment of the Commonwealth’s land Office^” (Sess. acts, p, 14;) and for “establishing a land office and ascertain^ the terms and manner of granting waste and unappropriated lands,” (p. 21.) The acts of Virginia, which recognized and defined and regulated as valid, and to be secured under her laws, were all existing and in force in 1789. To prevent the revival of the claims so declared void by Virginia, because not derived under the reformed system of 1779, to prevent the revival of the claims under the royal proclamations, orders of council, and entries in the council books, and indiari title, it was necessary and proper, in the compact, to introduce the expressions and provisions, that the validity of all private rights and interests should be decided by the laws of Virginia then existing-, otherwise, the multiplied evils recited in the preamble of the act of 1779, might again have sprung up. If the laws of Virginia for deriving titles, from the State itself, as one party, to the individual contracting with the State, or claiming immediately and directly from her, as the other party, be selected as the laws comprehended in the compact, then the expressions and effect will be appropriate to the state of facts, and have a full, unrestrained and sensible meaning, because all such laws were then in force. But if the selection be not confined to such laws, but advanced to the laws of derivation of title and interest from individual to individual, the expressions “now existing” will produce great mischief and confusion, because in the intermediate time between the act of 1779, and the act of 1789, proposing the compact, the laws for derivation of interests and rights between citizen and citizen, had been repealed and changed, particularly- in relation to descents, devises, survivorship and the statute of frauds, all of which former repealed laws, as well as those existing in 1789, on those subjects, ought *502 to be the rules of decision according to the appropriate periods and facts, at which the descent, de-' vise, survivorship, or contract is claimed. If these laws of Virginia, of descent, devise, &c. are embraced and comprehended in the compact, the laws of Virginia, of conveyances, óf limitation of actions, and of executions, &c. must, by the same principle of construction, be retainéd, to the exclusion of all legislation by Kentucky on those subjects. If such construction is given into, the powers of the' government of Kentucky will be so curtailed, and diminished as to be inadequate to the necessary and essential purposes of government. If such construction be adopted, as will include the forfeiture laws, and the limitation laws of Virginia then existing, to the exclusion of the power of Kentucky to pass other and different laws on those subjects* The same principle must also bring in various other laws then existing in Virginia, to the exclusion of the laws which have been enacted in Kentucky, other and different from the laws of Virginia, to the great confusion and disturbance of society. If, on the other hand, the selection of Virginia laws, which are to be the rules of determination, be confined, to such laws, under the expressions “now existing in this State,” as were established for determining the validity of claims between the government as grantor, and the citizen as grantee, taking such as permanent and unalterable by Kentucky, then the whole intent and meaning of the compact will be complied with; the validity of private rights and interests as against the State, will be determined by the only proper and intended laws, the derivations between citizen and citizen will be determined by the appropriate laws of Virginia, and of Kentucky in force at successive periods; all will be order and harmony. The valid claims against the government will be held and remain valid, into whosoever hands they may lawfully pass, secured under the laws of Kentucky by the pledge of faith and moral sentiment, by the security resulting from the organization and moral action of the government, guaranteed by that universal sentiment of respeect for private property, which belongs to *503 the nature of civilized man, and under the sanction of that sentiment contained in the constitution of the United States. This construction will avoid thé absurdity of endeavoring to fix upon the people, forever, a government, or its laws, which are inadequate, or contrary to the common benefit, protection and security of the community. By the declaration of rights made by Virginia, in 1776, and prefixed to the organization of the government, she declared, “that all men are by nature equally free and independent, and have certain inherent rights, o.f which, when they enter into a state of society, they cannot by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety. That government is, or ought to be instituted for the common benefit, protection and security of the people, nation or community; of all the various modes and forms of government, that is best, which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of mal-administration, and that when any government shall be found inadequate or contrary to these purposes, a majority of the community hath an indubitable, unalienable and indefeasible right to reform, alter or abolish it, in such manner as shall be judged most conclusive to the public weal.”
Not the intention of Virginia to fix. on Kentucky injurious laws, nor to deprive her of necessary powers
Virginia could not have intended to divest posterity of rights declared by her, so solemnly to be indubitable and unalienable, by fixing penalty and forfeiture laws on them, howsoever inadequate or contrary to their protection, security and happiness. The construction which I have given to the compact, is consistent with this declai’ation of rights; the other impugns it. To stipulate for the permanency of laws defining private rights and interests of lands, and the validity of those vested rights, consists with the natural right and desire of acquiring and possessing property, and pursuing happiness. If Virginia herself, had repealed such laws, the private rights and interests, vested and acquired, previous to the repeal, would have rc- *504 niained valid. But to stipulate for the permanency of penalty laws, forfeiture laws, limitation laws,&c. &c. (which she herself might have altered and abolished, or reformed at pleasure, without any imputation of infringing, or impairing private rights and interests,) and to impose those laws upon the people of the proposed State, and their posterity forever, without the power to alter or reform them'as Virginia herself might, would have been a violation of her own principles, and a departure from the declaration of rights. The compact, from its terms, does not require a construction in violation of such declared rights. Where the powers of the proposed government are intended to be restricted, those restictions are expressed in clear and direct terms in other articles. A denial of the just, necessary and inherent powers of government and legislation cannot be justified by implication and construction of a doubtful sentence, abstracted from its connexion with other parts of the compact. Stronger evidence of the error of the construction contended for by the defendants cannot be desired, than that both parties to the compact, immediately after its ratification construed it otherwise; that it seeks to defeat indulgencies against penalties and forfeitures which were conceded and extenfced by laws, not merely assented to, in silence, but positively enacted and continued by so many successive assemblies of Virginia and Kentucky, as expedient and proper.
Bowers of the legislature, to alter and repeal laws.
I can comprehend a private right and interest in a thing, a subject of property, which right has originated and vested under a public law; but I deny that a citizen can have a private right in the very law itself, so as to prevent its repeal, alteration or reform; a public law enacted by one legislature, may be altered, reformed or abolished by any succeeding legislature.
I conclude, therefore, that the entry of Campbell has not become forfeited and void; but that it is the superior ecpitable claim for all the land which shall ,be found common to the survey thereon, as actually made and carried into grant, and the survey whgn made, as herein before expressed.
Complainant' must iecover on the va-lidityande-llis own ^au-
the legal ti-tie, may hayo aretÍea etUd--versary claims.
whatmust be shewn by one seeking the^elde™8* grant,
statement of the oase-
A complainant must recover upon the validity and equity of his own claim, derived to the land from the Commonwealth, to enable him to have a decree against an adversary conflicting claim, also deduced from the Commonwealth.
This is the general doctrine. I recollect but a solitarv exception, and that is under the statute of 1796, (1 Litt. laws 521, sect. 29; 1 Dig. 221,) au_ thorizing any person having the legal title and possession to institute suit against any other person setting up a claim thereto; “and it the complainant shall be able to establish his title to such land, the defendant shall be decreed to release his claim thereto.” The construction given to this statutory jurisdiction by the case of Sterling and Davis, (2 Bibb, 521-2,) was, that a complainant so situated, might have a decree without a valid entry and corresponding survey, and that in such case, a patent not fraudulently obtained, was sufficient to obtain a decree, in a contest with those having no title, either at law or in equity, originating anterior to" the patent of the complainant.
In all cases where the complainant seeks relief against an elder grant, he must show an existing, valid entry, not illegal, forfeited or destroyed, Whatever invalidates the claim of the complainant jn equity, is a good and available defencp. I have said this much on the subject of the defence allowable generally to defendants, to prevent misconception of what I have said, in a former part of this opinion, in allusion to certain questions’ which might have arisen between the Commonwealth and proprietors of entries, respecting forfeitures claimed for not attending the surveyor upon notice, or for failing to appoint an agent within the period ulti? mately prescribed and limited.
Opinion of
Judge Minns.
This is a contest between conflicting land titles, each party holding by adverse entries, surveys and patents, originating under the laws of Virginia. The defendant in error brought his ejectment on his elder grant, and obtained judgment; the plaintiffs in error exhibited their bill in equity, *506 setting up their entry as valid. The court below dismissed that bill and to reverse that decree, they have prosecuted this writ of error.
Dates of the complainant’s entry, survey and grant.
Defendant’s claim stated.
Objected that complainant’s entry had been forfeited.
Statutes of Kentucky, granting extensions of ' the time for surveying entries, alleged to be against the compact with Virginia.
Act of ’85 le't the Surveyor to elect i,is own time to give the owners °-f en~ aUewHo06*° have them surveyed: Until notice. no e»try PouW Pe lost ynesec'
*506 Some preliminary objections were made to the claim of the plaintiffs in error, which ought to be considered before the merits of their entry are investigated.
The entry set up by them was made in the name of Arthur Campbell, for 600 acres, on a Treasury warrant, dated June 2d, 1780. The survey on the 8th of February, 1796, and the patent issued on the 8th of November, 1796.
The entry of the defendant in error is for 1,000 acres, on a Treasury warrant, dated January 22d, 1787, in the name of William MTlwee. The survey was made on the 21st March, 1787, and the grant issued on 23d of June, 1795.
It is insisted in the answer of the defendant in error, and also in the argument, that the entry of the plaintiffs was forfeited or had become void, because it was not surveyed in the time allowed by law, or if it was so surveyed, that it was made after the first day of January, 1796, and that the holder thereof had not saved it by appointing an agent in the county, and giving notice of such appointment to the surveyor, before the 1st of January, 1796, he not residing within the county where the land lay.
It is further insisted, that as the entry was made in the time allowed by the legislature of Kentucky, granting an extension of time for making surveys, still under those laws the holder thereof could acquire no title, against a previously vested right under the law of Virginia, because that, by the compact between Virginia and Kentucky, such claims as the defendant in error holds, must be decided by the laws in force in Virginia at the date of the separation and not those made afterwards by Kentucky.
These questions will he attended to in order. The act of Virginia of 1785, which last regulated the tune of making surveys, did not fix any time in. *507 which surveys must be made, but placed all entries then existing, in the power of the surveyor of the county where the land lay, to forfeit them, by giving notice to their respective owners of the time he would proceed to make the survey, and if any owner did not attend at the time, with proper chain carriers and marker, his entry became void. So that if the surveyor never moved in this matter, the entry was never lost or forfeited.
Act of >85 required the °X”clns0°f e“" dent’in°theS1' county, to appoint ana-¿¡eive theSur-veyor’s no-tioe>antl give the Surveyor information * ere0 *
Extens;on of the time allowed for the appointment of agents.
lmking°sur-voys.
Extension of mnJún^the surveys did not prolong tlie tim° for annoumn<r gents; but when the agent was not appointed prior to Jan. ’96, the entry was forfeited.
*507 But the same act imposed upon the holders of entries certain duties, to be performed by them, in which, if they failed, their entries should become void. It provided that, “the owners of entries already made, shall, on or before the said first day of January, [1787,] appoint some person within the county where the lands lie, as their agent, or attorney, who shall give notice of such appointment to-the surveyor, within one month thereafter, or on failure thereof his entry shall become void.” Then follows a saving of the rights of infants or prisoners in captivity.
The time fixed by the act was prolonged by subsequent acts of Yirginia, till the separation of the two States took place, and it was then extended by Kentucky, in two successive acts, till the first day of January, 1796, and there is no express extension of it afterwards.
But the legislature of Kentucky, by an act of 1795, simply provided that there should be allowed till the last day of November, 1797, to the owners of entries to survey the same, and by a subsequent act, that the further time of ten months after the last day of November, 1797, should be allowed to the owners of entries to survey the same, without saying in either of these acts, any thing about extending the time for appointing agents and giving notice thereof; 2 Dig. L. K. 717.
It might be a question of some doubt, if it was one of first impression, whether these two last acts did or did not, by implication, continue the time for appointing agents till the last of September, 1798. But this court seems to have considered the ques- *508 lion, and to have decided that the time to appoint agents and give notice thereof, expired on the first day of January, 1796, in Brown vs. Starke, 2 Marsh. 29, and to have held an entry void, although an agent was appointed and notice thereof given in 1797. This might, at first blush, be supposed to settle this question against the plaintiffs in error, because Campbell did not reside in the county where the land lay and there is no express proof that he appointed any agent therein, and gave notice thereof to the surveyor, before the first day of January, 1796.
"Where the snrvoj is dated prior to Sept. ’98 (the time allowed for making surveys generally,) the complainant’s bill need not allege the facts shewing the right to survey the entry: otherwise when the surveys was made af-wards.
Survey made between 1st Jan. ’96 and Sept. ’98 shall be presumed to have been lawfully made, unless the adversary party allege and show the entry forfeited.
There is, however, a material difference between this case and the case of Brown vs. Starke. Starke’s survey was made after all the extended time of surveying was out, to-wit: in 1805, and he was not within the savings of the act. Between the cases, where surveys were made within the extended time, and those made since, this court has made different requisitions in the pleadings of the parties. In the former, the complainant is allowed to set out his entry, survey and patent with proper averments of their validity, and no more, and the objection to the making of the survey, at the time it was made, must come from the answer of the defendants, so that he must, in some measure, take the burden of opposition on himself. In the latter, the complainant in his bill, must show that he, or the holder of the entry, was within the exceptions, and excuse his delay in not surveying at an earlier period.
There is another distinction that may be taken, which will operate in favor of the complainants here. At the time this survey was made, the surveyor had unquestionable authority to make surveys generally; the only enquiry could be, had the owner complied with the requisites of the law, in appointing an agent and giving notice. If he had not, then the surveyor ought not to have made it. Something is due to the acts of the surveyor under such circumstances of general authority. We ought to presume that the owner had, in proper time, appointed his agent, and that the surveyor, by giving proper notice, had, brought on the survey. The *509 notice was a matter between himself and the owner of tlie entry. The surveyor was not bound by law to record the notice, if written, inperpeiuam m me-moriam; he might cast it aside after the survey was made. I cannot indulge a presumption against the acts of tlie surveyor, while his authority was general, as it was before tlie last day of September, 1798. But after that period, as the authority was special, and he could only execute surveys on an entry here and there, owing to the particular circumstances of the owner, it cannot be wrong to require of him who sets up the entry, to show that his entry formed an exception to the ruje, and that, while the entries not surveyed generally had become void, his had retained its validity, by his complying strictly with the requisites of the law. Such was the requisition hi the case of Brown vs. Starke, but cannot be required here, when the survey was made so shortly after the first day of January, 1796, and within the time when entries generally might be surveyed.
Appointment of an agent in the county, will be presumed.
Question of the consistency with the compact of the statutes of Kentucky, extending the time allowed by Virginia, for making the surveys on entries, stated.
' Without, therefore, impeaching the case of Brown vs. Starke, or deciding upon the question whether the acts which extended the time of surveying since the first day of January, 1796, extended also the time for appointing agencies and giving notice thereof, I conceive that the entry of the plaintiff in error cannot be affected by the want of the appointment of an agent, unless it had been shown negatively that no such appointment was made.
The next inquiry is, was the entry of the plaintiffs in error lost, because fit was not surveyed under the extension of time given by Virginia, but after-wards, under the extension granted by Kentucky? That question may be thus stated: The compact between Virginia and Kentucky, which took efiect en the first clay of June, 1792, when it also became part of the constitution of Kentucky, has the following clause: “All private rights and interests of lands within the said district, [Kentucky,] derived from the laws of Virginia prior to such separation, shall remain valicl and secure under the laws of the proposed State, and shall he determined by the laws *510 ndw existing in this State.” It is therefore urgedy that as the survey of the plaintiffs in error was made after the time allowed for appointing agencies, giving notice thereof and making surveys by the laws of Virginia, and within the extended time allowed by the ‘‘laws of the proposed State” to save his entry by such extension of time by Kentucky, would be determining the case by “the laws of the proposed State,” and not the pre-existing laws of Vivginia.
soidcd in by’s heirs M’Murray, it alter-areis the onion with-awn, and estion left idetermin-
To raise the question of the validity of the statutes, the parly asserting it, must shew an interest in the land at the date of the compact or at the separation.
One claiming under a survey made on an invalid entry, or one not embracing the ground and a grant from Kentucky, has no “right nor interest” secured by the compact; —Survey is' no appropriation of the land»
*510 This question was raised and decided in the case of Hoys’ heirs vs. M’Murry &c. 1 Litt. rep. 364, as between Hoys’heirs and the heirs of Trimble. Afterwards, by an amendment to the record brought up from the court below, it was discovered that the case was not pending between Hoy’s heirs and Trimble’s heirs, and without affirming or denying the correctness of the principles then advanced, the case went off on other grounds as to the real parties, and since then the question has not presented itself in such a shape as to require a decision thereon.
Nor do I apprehend that a case is now presented, requiring a decision of the question. For the party who insists upon the question must show a subsisting right or interest in him, derived from the laws of Virginia, either at the time the compact was executed by Virginia, or when the separation of the States took place, to make the question operate in. his favor.
This leads to the inquiry whether M’llwce, under whom the defendant in error claims, had such an interest in the land in controversy. He had an entry made in 1187, and a survey in the same year. He has not shewn that his survey covers the same land embraced by his entry, and from the proof in the cause it evidently does not do so. He, therefore, had a naked survey on the land, without an entry, when the separation of the two States took place, and it is expressly decided by the Supreme Court of the United States, in the case of Wilson vs. Mason, 1 Cranch. 45, and by this court in M’Minn vs. Stafford, 2 Bibb, 487, that such a survey is no appropriation of land, that it is a void act, *511 and the land is vacant. Such has been the uniform tenor of the decisions of this court, and relief has been granted to entries on lands surveyed without entry, or not on the ground covered by the entry, when no patent had issued. An entry or a patent alone, have been held an appropriation of land, so that whatever doubts might be entertained on this question, were it new, they cannot be indulged against so much authority. M’llwee, therefore, holding a survey alone, not on ground previously entered by him, had neither right or interest in the land in question. As to him and the Commonwealth of Kentucky, the land was vacant, and Kenlucky could either grant it to any other person, or keep alive the entry of Campbell, if it is valid, by extending the time of survey, and allow him to complete his title, and also to claim relief against the grant of M’llwee, obtained in the mean time.
Question, of the validity of the Acts, undecided.
Dissent from the view taken by the Chief Justice, and reasons for stating the difference.
If then, it be conceded that the legislature of Kentucky, by extending the act of 1785, down to the first day of January, 1796, or even till the last day of September, 1798, could not let in entries, which would otherwise have become void, to take away lands from those who held “rights” or “interests,” in the same land previously acquired from the State of Virginia, (a question not intended to be decided,) still the defendant in error cannot avail himself of such defect of power, for the want of such “right or interest.”
I have been thus particular in showing that this patent cannot claim the protection of the compact, and that it is not within the principles touched in the case of Hoy’s heirs' vs. M’Murry &c, and, therefore, it does not become absolutely necessary to reconsider the doctrine there expressed. For when a question does not arise, judges should not travel out of the way to discover and decide them by anticipation. But as the Chief Justice has thought the question made, and presented for decision, and has expressed his opinion tfully upon the point, I deem it right, in a summary manner, to say something further upon it, to exclude the supposition that I acquiesce in the view of the case which *512 be has given. I did not sit in the case of Hoy’s heirs vs. M’Murry, (for reasons not necessary to be stated,) although I had then the honor of a seat on the bench. The reporter .has not noticed my absence, but it is presumed the record, at the hearing of the cause will show it. This is the first time, therefore, that I have been officially called upon to say anything upon the question; what is now said, is more designed to leave the question unprejudiced, till a proper case demanding its decision occurs, than to conclude it.
Doctrine of Hoy’s heirs and M’Murray would not render the Acts, extending the time for surveying entries, null, but leaves the Acts valid in all respects, except where the survey thus made, interferes with before-existing rights or interests, held under the laws of Virginia.
Effect of the statutes, unrestrained by the compact, on the litigation of land titles and the peace of the occupants.
I have met with no case, not even the case of Hoy’s heirs vs. M’Murry, that declares the acts of Kentucky, which extended the time of surveying Virginia entries, to be void. Such a proposition has never been advanced. These acts always have had, and still will have an important and extensive operation, however this question may be decided. They did permit all claimants of the vacant lands in the Commonwealth to complete their claims. Their power to do this is unquestionable, and if the legislature were now by law, to permit all the dormant and forfeited Virginia entries to be surveyed and carried into grant on the vacant lands below the Tennessee, none could dispute the power to pass the law, or deny the validity of the grant, whatever might be the policy of the measure,
But .this is not the effect or operation of these acts of Kentucky extending surveys of which the defence in this case complains; nor is this the operation refused to these acts in the case of Hoy’s heirs vs. M’Murry &c. At the time these acts passed in Kentucky, extending the right to survey a large portion of the State, was covered already by one, two, three or more grants. On many or most of them, grants completed under the laws of Virginia, many settlers had located their domicils and fixed, as they believed, tbeir permanent homes. On many of these grants and settlements, there still existed numerous surveyed entries, and their right to be surveyed at all did not, and caukknot, longer exist. If Kentucky did not extend the time, and it was left to expire, as Virginia said it should, then *513 these prior grantes were, by the laws of Virginia, existing at the separation, freed from the serpentine danger of these dormant entries; on the contrary, if Kentucky extended the right to survey and gave to these secret claims, full validity, they would derive new life and vigor from Kentucky legislation, and be able to take from these ancient patentees and spiders, both their grants and their homes, and instead of their rights as derived from Virginia, remaining “valid and secure under the laws of the proposed State;” they would not only pe jeopardized but actually taken away, by the laws of this new State. This is the consequence disputed by the de-fence in question, and refused in the case of Hoy’s heirs vs. M’Murry &c.
Objectsin tlie enactment of the statutes.
Question on the compact stated.
Equity wilt not enforce a forfeiture, nor enforce a foifeited ' claim, against a legaj estate.
If every legislator who passed or voted for the extension laws, had been asked if he intended such disastrous consequences, it is presumed he would have answered in the negative, and that his object was to permit his fellow-citizens to complete their claims on the vacant lands and not pn those already appropriated.
The question is not, ’whether the State can release a forfeiture, (if forfeiture it can be called,) on lands belonging to itself, but whether she can release it on lands belonging to others by the grant of the State of Virginia, so as to take from those others the land baclt again, and that, after their title from the State was complete, and grant it to those to whom the release of the forfeiture was given. This is a consequence of a serious nature, at which the court stopped shpr.t in the case of Hoy’s heirs vs. M’Mur-ry &c. and if by thus stopping the judges erred, their error would certainly be venial, and I trust I will be pardoned if I consider fhe question a serious one, and worthy of more deliberation.
I do not feel alarmed at courts, and even courts of equity noticing forfeitures; for though equity may not enforce a forfeiture in behalf of a complainant, who asks her aid, it is nevertheless one of her rules, not to enforce a forfeited claim against a legal estate not forfeited. Norami disposed, at this day, to stir the question whether entries were' ever sub *514 jected, by the laws of Virginia, to any forfeiture at all, for not being surveyed in time. Nor will 1 suppose that the adjudication of a court on an inquest of office is necessary before a forfeiture of an entry can be proved. These are questions already closed by previous adjudications, loo numerous to be shaken, and it would be a waste of time and paper to enumerate them, as they are known to all who have read the reported decisions of the court.
■Cases of en- - tries defeated, because not'surveyed in time, and thus land controversies settled.
Effect of protecting tnc rights and interests in land at the separation, from the claim founded on surveys made under -the Acts of Kentucky, extending the time for surveying entries.
i Entry after entry, set up by bills in equity, have been defeated by this court, when in conflict with elder grants and settlers on the land, because they were not surveyed in time, without any higher proof than the plats and certificates of survey and depositions. Indeed these decisions have been one of the efficient means of disburdening our dockets of landed controversies between adverse conflicting titles derived from Virginia. This rule of decision combined with the efficient operation, which this court has given to our statutes of limitation, has nearly settled the struggle between claimants, and left the residents of the soil in quiet and repose.
The question now proposed objects to the right of another class of claimants to survey over the head of ancient patents from Virginia, and then to take such grants away along with the soil. It is insisted, if the laws of Virginia, in force at the separation, had been permitted to operate, without any new rule adopted by Kentucky, this class of claimants, and a numerous class it is, could never have disquieted elder grants and taken away prior-vested rights, and, therefore, all this class ought to be checked as they pass through the ordeal. If such additional check can be imposed, it will end more litigation, and add still more to the increasing repose of the country., I do not see why the question cannot be made, as it is attempted, here, by answer and proof, as it has been done in other cases, and if it be in favor of the elder grants and vested rights, and shall conduce to the repose of the country, why it may not be decided against modern surveys under'Kentucky statutes, directed by experienced counsel, and framedto suit the previous decisions of *515 courts, of which ancient claimants could not avail themselves; and why the courts may not decide against the right to survey without an inquest of office or prior adjudication. It must be more pleasant to any judge to decide against the right to make such surveys, if the law be against them, when he remembers that he thus terminates many controversies, with which the country has been "too long burdened, and that he adds to the repose and security of many an occupant, who would otherwise be disquieted and turned out of doors. This causes me to pause solemnlyat the question set up in this defence. But trust I shall not feel so strong a leaning on that side as to disregard the law of the laud, when a case is properly presented; and if I shall then be convinced that such late surveys on ground previously covered by elder grants, are consistent with the compact with Virginia, and the law of the land, I hope to have the firmness to deliver that opinion, disregarding the consequences.
“Laws now existing in this state” in the 7th section of the compact with' Virginia, means the laws in forest-when Kentucky became a state, not the laws.in force at the date ofr the enactment of the proposition by Virginia.
I shall not detain long to fix the precise time to the word “now,” existing in the clause of the compact in question, and shall barely remark, that it would seem as Virginia wrote the compact and proposed it to the people of Kentucky for their adoption, that the hour of its adoption and the completion of the agreement, was the moment of the word “now,” and the time that it designates. If this be correct, it will follow, that the laws of Virginia originating land titles, as taken by Kentucky at the separation, were the laws intended to be preserved; for it would be difficult to account for Virginia binding Kentucky not to alter the laws before that time, when Kentucky was not then in existence as a State, and of course could not before that time legislate at all on the subject. On this view of the matter I am disposed to throw out of the question all the legislation of Virginia in extending the time of surveying between 1787, when the compact was proposed, and 1792, when Kentucky came into existence, as having no weight in construing the compact. The force of the precedent extracted from such legislation, in construing the compact, is not perceived for another reason still more palpable.
Held, Bie Jaws of— Fbrfeitnre for non-improve-raent, Revenue Jaws, Subjecting lands to payment of debts, Descents, Wills, Conveyances, Trespass, Frauds, Joint tenancy-Survivorship, booking entails, Limitations— nor our
Virginia, when site proposed the compact in llOT, did not intend, or propose to bind herself not to legislate farther on her land titles, while her power remained over the subject. ' It was the “proposed State,” she thus offered to bind, and not herself; she was able to trust herself, without such a voluntary obligation on her hands. Kentucky, the proposed State, could not legislate about the titles till she became a State, and then Virginia could not; for her po\v,er was withdrawn' from the territory, of course it seems to follow, that any act passed by Virginia before the separation cannot be looked upon as a precedent for construing the compact, and furnishing any ground for an inference that Kentucky is not bound not to. extend the time of surveying to tíre prejudice of vested rights, because Virginia extended it when she was under no obligation to abstain from it. Andas to the legislation of Kentucky, since its propriety forms the very question to be proved, it cannot be competent to allege the existence of the fact, as a proof of its propriety.
But I may be met with á serious train of consel qüences, and told that such a construction of the compact will throw our code into confusion, and nearly unhinge society by bringing estates back to ancient Virginia laws. I may be fold that the following laws were in force, in Virginia, at the date of separation, or before, in 1787, and that each have undergone important changes in Kentucky, and if this construction prevails, estates must revolutionize, the laws of forfeiture for non improvements: the revenue laws; subjecting lands to tile payment of debts; descents; wills; regulating conveyances; tresspasses; the statutes of frauds; joint tenancy and survivorship; docking entails, and even acts of limitation, and granting innocent accupants pay for their improvements. I have viewed those, supposed consequences without alarm, and am satisfied other arguments are necessary to throw light on the question, and that these consequences can never flow from enforcing the opinion of Hoy’s heirs vs. M’Murry &c. andthfit these laws, as modified or changed by Kentucky, cannot be thereby shaken, but must receive confirmation and *517 síability from it. It could not be, and was not the intention of the compact with Virginia, to include every law regulating lands, or their alienation, or transmission from one person to another, and to transmit them immediately to Kentucky. No tie-cisión of this court, or any other, lias advanced such an idea, except one, and that is the decision of the Supreme Court of the United States, on the occopying claimant laws, in Green vs. Biddle, (8 Wheat. 1,) to which this court has refused to submit, and that because in its principles, it carries with the compact many laws relating to land titles and fixes them irrevocably on Kentucky, which this court has believed never to have been included in the compact.
Occupant laws — are not ^jeventh section of the compact,
seventh see-tiori of the compact em-theTtatutes of Virginia,in which o-nSinaJecli regulated, the compie-theTtauTas grantor, and corporations aís^tís her”" grantees— The statutes saf^y^aro here includ* eiU
The question then is, what laws were: included in the compact? The class must, and may be pointed out so distinctly as to know them from all others. The answer is, the statutes of Virginia, which originated and regulated the completion of land titles, from the State, as grantor, and individuals or bodies corporate, as grantees. These and no others, were to be preserved, and held inviolate, and it is because the statutes regulating surveys, are a part of these laws, that the difficulty arises, and here is the stress of the question. How then can there be any danger of reviving other laws by giving force to the compact? If the laws regulating land titles between the State and her grantees are alone included, and all others are not included, a conclusion follows precisely contrary to the supposed revival of the "ancient laws, modified, repealed or recently moulded by Kentucky. Kentucky, consequently has a full and unrestrained power to alter or change these latter laws, provided she leaves one class of another kind inviolate. I cannot, therefore, for a moment suppose, that the defence now contended for, if allowed, would afibet the laws directing sales of land by fieri facias, or regulating descents, wills, conveyances or such like, long adopted and practiced in Kentucky. I cannot admit that it would spring a docked entail, impaira conveyance, oust an heir, overturn a will, or quash an execution. They would all be safe and secure; nor could it affect our favorite-systems of *518 occupant laws, and limiting real actions. My most fervid imagination could not be enabled, with a strange facility in the association of ideas so remote from each other, to present the figure, that when a recent survey, in a struggle to take away an ancient vested right, should happen to fall by the compact, consequently the occupant laws and acts of limitation, so essential to the repose of the country, were in danger. Hero lies the real difference between this court and that of the United States, so far as they have differed, on the subject of the compact. This court has ever supposed, as was held, not only in the case Hoy’s heirs vs. M’Murry, but in the case of M'Cracken’s heirs vs. Beall, 3 Marsh. 208, that only the laws regulating the rights between the State of Virginia and her grantees, and no others were included in the compact; and lienee this court has undeviatingly enforced every statute of limitations, and every occupant law adopted by Kentucky, and only regarded the compact as preserving one class of laws, while the Supreme court has seemed to suppose that, not these statutes of Virginia, but other and different laws, regulating remedies, and fixing the mere incidents of title, are included. Taking this as the course of decission in this court, all danger of disorganization and confusion are over.
Thp Federal Court lias included in the 7th section of the compact, the occupant and other laws of Kentucky, regulating only the remedy and fixing' merely the incidents of the right to land; this court excludes those laws.
Query— Whether the loss of an entry, by the ’ neglect to survey it in time, is a technical forfeiture, or but a failure to obtain by non-performance of a condition.
It may be said that the compact only preserves private rights, and not those of a public nature, and that, as a forfeiture is a public right, first belonging to the State of Virginia, and transferred by her to Kentucky, the latter State could easily release it without infringing the compact. The general proposition is granted; but can she release to one individual, so as to destroy the vested right of another, or does the right of the other remain unaffected by the release? Tills is the unsettled question. Can the State, by disposing of public rights, withdraw private ones granted by the very laws held sacred by the compact? I shall only add, that we are apt to treat the destruction of an entry by the ladies of the owner, as a forfeiture, and I have hitherto used that language in its popular acceptation. It may well he doubted, whether it be a forfeiture at all, in the teuchnical sense of the *519 term. Warrants were issued by Virginia, and the purchasers thereof were toJd, that if they would make an entry, a survey, return a plat and certificates, they might obtain a grant, and thus become vested with the title; but if they failed in any of these requisites, they never should have the land. These were properly conditions, with which each purchaser of a warrant must comply, and a failure in any of these conditions on his part, left him without land, or a claim which lie could enforce. He could not, therefore, be properly said to forfeit that which he had never obtained; but only that he failed to obtain that which he might have obtained by complying with the law.. The conditions are unfulfilled, and the decision against him, only determines that he has come short of performance, by reason of which, he is unable to take away the right of another who has complied. It is thus the question arises on the defence now considered. The defendant insists that the complainant has not complied with the requisition of the law, because that he failed to perform the conditions on his part in point of time. The complainant replies that the legislature of Kentucky has enlarged the time of performance, and then the defendant questions the fact, whether the legislature of Kentucky did enlarge the time, whether they had the right to en? large it, if it is attempted.
Evil consequences of maintaining the statutes of Kentucky extending the time for surveying entries against claims, o-tkenvise valid.
Applying the compact exclusively to the Virginia statutes regulating rights and interests, from herself, as grantor, and individuals, as grantees, and doubting the right of Kentucky under it to perpetuate the system, I cannot be shocked at the idea of one generation binding another, without their consent, or perceive the absurdity of our being bound by an ordinance adopted by our ancestors. Rather would I glory in being heir of the security of a government of correct principles and rational liberty, in which private rights are respected, than suppose it was the destiny of the present race, to witness and struggle with the streams of annual revolutions, produced by legislative enactments, not because such vicisitudes, are essential to happiness, but because we have the right to produce *520 them as a portion of the American family uncoif-trolecl by any laws, human or divine, unless ordained by ourselves, since the days of our fathers. Indeed, I view the danger of perpetuities entirely on the other side. If the compact is to have the effect contended for by the defence before us, then the Virginia system of laws, which originated claim on claim, in countless numbers, to the same soil, is allowed to run out its time, as the horologe, no more to be wourtd up, and produce its dismal lcnell, portending danger to the resident of the soil. But if the legislature of Kentucky is to wind it again and again, and at every revolving period it is to give fresh alarm, and infuse life into more claims, and by new legislation, Kentucky is allowed to show us one head of the Hydra after another, to legalize the numerous class of claiips pow dormant on our entry books, then may we in truth complain that our fathers in Virginia, by the land law of 1779, and subsequent amendments thereof, has perr petuated in this country, already proverbial for lauded controversies, a portion of disquietude and misery, instead pf repose and happiness, and that the numerous claims of Virginia upw dead, shall never fail to revive and fiarrass us, and all this because courts lean against enforcing forfeitures. Such a result deserves a pause.
Question of ió validity utes'feft'uñ-decided.
-The Entry-Call for Yel-th'e name of^ Flat creek not fatal..
Upper trace described yin the entry.
But as I conceive, that the claim of the defendant below, is not one entitled to make the question, * nee<f not progress further, and shall leave the question open for a future hour and a full court.
I come then to the entry of Campbell. I agree it is valid. The mistaken name given to the creek Creek, instead of Yellow Creek, cannot destroy it, because it did not mislead. There is no other creek to rival the one claimed, and none who travelled the road from the Gap to the creek, and seaching thereon could have doubted, that Yellow Creek was the one intended.
I also concur that the upper trace is the one intended. R passes the forks of the Creek, the other strikes some distance below. Indeed they are both different fprks of the same trace which sepa,- *521 rate near the Gap, and again unite beyond Yellow Creek. Both must have existed at the same tinte, although one set of witnesses, who prove one, did not know of, or believe there was any other. Each travelled the trace he was acquainted with, without examining the existence of the other, but a person in search, could not have failed to find both, and would at once conclude, that the one which run across the forks of the Creek near the junction was the one intended. For there alone could the entry begin on the road, and extend into the forks, and include the right hand fork: For its calls are,
Calls of the entl>
Jucl8'c ^yingthe1* entry?
“On Flat Creek, about two miles northwest of the main Gap of Cumberland mountain, on the road passing to Kentucky, from Powell’s valey, to begin at the said road, and to extend up in the forks of the Creek, including the right hand fork for quantity."
Going from the Gap two miles on the lower trace, would have brought the traveller near the main Creek, and the same distance on the other, would have placed him in the forks of the Creek. The call for the creek, the road and the distance are the general calls of this entry, designed to bring the enquirer to the neighborhood.
The mode of surveying is next. Nothing; in this entry conforms it to the road, and nothing Fea ves it room to depart from the squaring principle in which shape it must be run, by settled law, unless its calls require a departure.
The call “including the right hand fork” does not necessarily fequire tire line to conform to that fork, and run with its meanders. It must, therefore, lie in a square, the main body of the land must lie in the forks, and the right hand fork be included. This is to he done by commencing on the margin of the right hand fork, where the road crosses it, and on the northwe^tardly side, and extending a straight line up the right hand fork on the same side thereof, at so great a distance from the stream as will barely include it at every point, where the stream may approach it. This line must be the *522 length of the square root of six hundred acres, and then the survey must be run at right angles into the forks of the Creek, and crossing the right hand fork, till the quantity is included by aline parallel to the first line, and the complainants below will be entitled to all the land common to their survey as made, and his survey as actually made. In this mode every call will be complied with, whether general or special. It will be on the Creek about two miles from the Gap, and it will begin at the road, extend up in the forks, include the right hand fork, and place the main body of the land in the forks, which seems to have been the object of the locator. The land within the forks was his object, not disregarding the right hand fork, which was to be included, though certainly not in the centre of the survey.
-The two Judges silting in the cause, differing in-the mode of laying down the entry, and the circuit court having decided a-gainstit entirely, decree in favour of the owner of the entry, for the land common to the two inodes of surveying, and mandato accordingly.
'•DECREE AND MANDATE OP THE COÜRT.
This cause being -heard upon the transcript of the record, and the arguments of counsel, it seems to-this court, that the entry of Campbell in the bill relied on, is special and precise, as to part of the land surveyed thereunder; that said entry has not become void for want of a survey in lawful time; but that the survey and grant thereon are within lawful time. But the judges differ in opinion as to the manner in which the survey of said entry should be executed. Judge Mills is of opinion, that the the survey should be made by commencing on the margin-of the right hand fork of Yellow Creek, where the road crosses it, and on the northwestwardly side of the said fork, extending a straight line up the said right hand fork on the same side thereof, at so great a distance from the stream as will barely include it at every point where the stream may approach it; this line to be the length of the square root of six hundred acres, and then the survey must be run at right angles to this base, into the forks of the Creek, and crossing the right hand fork, till the quantity is included by aparallel to the first line. The Chief Justice is of opinion, that the base of a square area for six hundred acres, should he taken along the road from the right hand fork, to the left hand fork of Yellow Creek, and up the left *523 band fork, on the northwestardly side thereof, with the meanders and alongthe road on the northside of the right hand fork; so far in alias will be-necessary to give such base when reduced to a right line, to be bisected by the point within the forks, and on the right hand fork of Yellow Creek, where the road crosses it, from the extremities of this base so taken, extend lines up the right hand fork, parallel to the general course of such part thereof, as will be included in this survey, these projecting lines to be extended so far, as that the closing line, run at right angels to these extended lines, will give the quantity, so that the general course of the right hand fork thus included, will bisect the survey as nearly as practicable. The result of this difference is, that the entry must be surveyed in both of these figures, and for all the land which shall be found common to the actual survey as made, and to both the surveys as herein directed, the complaintant hath' the superior equitable claim. It is, therefore;- or-" dered and decreed, that the decree of the circuit1 court be reversed, that the cause'be remanded with directions to ascertain the land to be conveyed by the defendant to the complainant by meets, and' bounds, and to enter a decree according to the prim ciples of the aforegoing opinion, and conformable to the principles and usages of equity.
Benny, Iiaggin and Loughborough, for plaintiffs; Crittenden and Triplett, for defendants.
The complainants to have their costs in this be« half expended.